## STATE OF CONNECTICUT *v.* TOMMY HAMMOND
### (SC 16424)

Sullivan, C. J., and Borden, Katz, Palmer and Vertefeuille, Js.

Argued May 30—officially released August 21, 2001

*Elizabeth M. Inkster*, senior assistant public defender, with whom was *Michael S. Alevy*, assistant public defender, for the appellant (defendant).

*Robert M. Spector*, deputy assistant state's attorney, with whom were *Elizabeth Bodine*, assistant state's attorney, and, on the brief, *Michael Dearington*, state's attorney, for the appellee (state).

*Opinion*

KATZ, J. The dispositive issue in this certified appeal is whether the investigatory stop of the defendant, Tommy Hammond, by police violated his rights under the fourth amendment to the United States constitution.[1] After reviewing in the aggregate the trial court's findings, which are not challenged, we conclude that the police did not have the requisite reasonable suspicion before stopping the defendant. Consequently, the evidence recovered as a direct consequence of that unlawful stop should have been suppressed.

The record discloses the following procedural history. The defendant was charged with one count each

---

[1] The fourth amendment to the United States constitution provides in relevant part: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."

of possession of cocaine and possession of heroin in violation of General Statutes § 21a-279 (a),[2] one count of possession of heroin with intent to sell by a person who is not drug-dependent in violation of General Statutes § 21a-278 (b),[3] and one count of possession of heroin with intent to sell within 1500 feet of a school in violation of General Statutes § 21a-278a (b).[4] Follow-

[2] General Statutes § 21a-279 (a) provides in relevant part: "Any person who possesses or has under his control any quantity of any narcotic substance . . . for a second offense, may be imprisoned not more than fifteen years or be fined not more than one hundred thousand dollars, or be both fined and imprisoned . . . and for any subsequent offense, may be imprisoned not more than twenty-five years or be fined not more than two hundred fifty thousand dollars, or be both fined and imprisoned."

[3] General Statutes § 21a-278 (b) provides: "Any person who manufactures, distributes, sells, prescribes, dispenses, compounds, transports with the intent to sell or dispense, possesses with the intent to sell or dispense, offers, gives or administers to another person any narcotic substance, hallucinogenic substance other than marijuana, amphetamine-type substance, or one kilogram or more of a cannabis-type substance except as authorized in this chapter, and who is not at the time of such action a drug-dependent person, for a first offense shall be imprisoned not less than five years nor more than twenty years; and for each subsequent offense shall be imprisoned not less than ten years nor more than twenty-five years. The execution of the mandatory minimum sentence imposed by the provisions of this subsection shall not be suspended except the court may suspend the execution of such mandatory minimum sentence if at the time of the commission of the offense (1) such person was under the age of eighteen years or, (2) such person's mental capacity was significantly impaired but not so impaired as to constitute a defense to prosecution."

[4] General Statutes § 21a-278a (b) provides: "Any person who violates section 21a-277 or 21a-278 by manufacturing, distributing, selling, prescribing, dispensing, compounding, transporting with the intent to sell or dispense, possessing with the intent to sell or dispense, offering, giving or administering to another person any controlled substance in or on, or within one thousand five hundred feet of, the real property comprising a public or private elementary or secondary school, a public housing project or a licensed child day care center, as defined in section 19a-77, that is identified as a child day care center by a sign posted in a conspicuous place shall be imprisoned for a term of three years, which shall not be suspended and shall be in addition and consecutive to any term of imprisonment imposed for violation of section 21a-277 or 21a-278. To constitute a violation of this subsection, an act of transporting or possessing a controlled substance shall be with intent to sell or dispense in or on, or within one thousand five hundred feet of, the real property comprising a public or private elementary

ing his plea of not guilty, the defendant moved to suppress the narcotics that had been seized from his person and to dismiss the charges, claiming that they were the poisonous fruit of an illegal stop and that, without the illegally seized evidence, there was no basis upon which to continue the prosecution. See General Statutes § 54-56.[5] Following an evidentiary hearing, the trial court, *Schimelman J.*, denied the motions.

Thereafter, the defendant's case was tried to a jury, which convicted him of all the charges, with the exception of the one count charging him with § 21a-278 (b), on which the jury returned a verdict of guilty on the lesser included offense of possession of heroin with intent to sell in violation of General Statutes § 21a-277 (a).[6] The trial court imposed a total effective sentence

or secondary school, a public housing project or a licensed child day care center, as defined in section 19a-77, that is identified as a child day care center by a sign posted in a conspicuous place. For the purposes of this subsection, 'public housing project' means dwelling accommodations operated as a state or federally subsidized multifamily housing project by a housing authority, nonprofit corporation or municipal developer, as defined in section 8-39, pursuant to chapter 128 or by the Connecticut Housing Authority pursuant to chapter 129."

[5] General Statutes § 54-56 provides: "Dismissal of information by court. All courts having jurisdiction of criminal cases shall at all times have jurisdiction and control over informations and criminal cases pending therein and may, at any time, upon motion by the defendant, dismiss any information and order such defendant discharged if, in the opinion of the court, there is not sufficient evidence or cause to justify the bringing or continuing of such information or the placing of the person accused therein on trial."

[6] General Statutes § 21a-277 (a) provides: "Any person who manufactures, distributes, sells, prescribes, dispenses, compounds, transports with the intent to sell or dispense, possesses with the intent to sell or dispense, offers, gives or administers to another person any controlled substance which is a hallucinogenic substance other than marijuana, or a narcotic substance, except as authorized in this chapter, for a first offense, shall be imprisoned not more than fifteen years and may be fined not more than fifty thousand dollars or be both fined and imprisoned; and for a second offense shall be imprisoned not more than thirty years and may be fined not more than one hundred thousand dollars, or be both fined and imprisoned; and for each subsequent offense, shall be imprisoned not more than thirty years and may be fined not more than two hundred fifty thousand dollars, or be both fined and imprisoned."

of fifteen years consecutive to a previously imposed sentence the defendant was then serving.[7]

The defendant thereafter appealed from the judgment of conviction to the Appellate Court, claiming that the trial court's denial of his motion to suppress was improper because the investigatory stop violated his fourth amendment rights. The defendant also claimed that the trial court had improperly failed to merge his two separate narcotics convictions for possession of heroin and cocaine under § 21-279 (a) despite the fact that the convictions arose out of the same incident.[8] The Appellate Court affirmed the defendant's convictions; *State* v. *Hammond*, 60 Conn. App. 321, 759 A.2d 133 (2000); and this court granted the defendant's petition for certification to appeal, limited to the following questions: "(1) Did the Appellate Court properly conclude that the defendant was not illegally seized in violation of the fourth amendment to the United States constitution?"; and "(2) Did the Appellate Court properly conclude that the defendant's two convictions for possession of narcotics in violation of General Statutes § 21a-279 (a) did not violate the federal and state prohibitions against double jeopardy?" *State* v. *Hammond*, 255 Conn. 907, 762 A.2d 911 (2000). We agree with the defendant's first claim and, therefore, do not address the second certified question.[9]

---

[7] Pursuant to *State* v. *Chicano*, 216 Conn. 699, 584 A.2d 425 (1990), cert. denied, 501 U.S. 1254, 111 S. Ct. 2898, 115 L. Ed. 2d 1062 (1991), the trial court merged the defendant's conviction of possession of heroin under § 21a-277 (a) with his conviction of possession of heroin under § 21a-279 (a).

[8] The fifth amendment to the United States constitution provides in relevant part: "[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb . . . ."

[9] In its brief, as an alternate ground for affirmance, the state argues that we should reconsider our decision in *State* v. *Oquendo*, 223 Conn. 635, 647, 613 A.2d 1300 (1992) (reaffirming application of standard set forth in *United States* v. *Mendenhall*, 446 U.S. 544, 546, 100 S. Ct. 1870, 64 L. Ed. 2d 497 [1980] that seizure is made when, in view of all circumstances surrounding incident, reasonable person would believe he was not free to leave), and adopt instead the standard enunciated in *California* v. *Hodari D.*, 499 U.S. 621, 111 S. Ct. 1547, 113 L. Ed. 2d 690 (1991) (in absence of physical restraint,

The record discloses the following facts as found by the trial court. On February 12, 1997, a telephone call was made to the New Haven police substation, located at 26 Charles Street, from an anonymous source complaining of drug sales on the steps of Varick Church, located at 246 Dixwell Avenue, at the intersection of Charles Street and Dixwell Avenue in New Haven, one block from the police station. Herman Badger, the police sergeant who received the telephone call, did not recognize the caller's voice and could not recall whether the caller was male or female. Badger believed that the caller was excited and upset. The caller indicated only that the two subjects in question were black males of differing heights and gave only a partial clothing description, namely, that one of the subjects wore a blue and white coat, and the other wore a blue and red coat. The church was in an area known for previous drug sales. Badger contacted Officer Richard Zasciurinskas, who was in his marked patrol car, and instructed him to proceed to the church. Badger and Officer Samuel Bagley, both in full uniform, then left the substation on foot and headed toward the church. At the corner of Charles Street and Dixwell Avenue, they observed two subjects who matched the description the caller had given, but neither officer noticed any conduct indicative of narcotics-related activity. As the officers reached the intersection, the subjects under observation, who were approximately twenty to thirty feet from the officers, turned and walked across Dixwell Avenue to the east side of the street and began to walk northbound. Badger radioed Zasciurinskas to stop the subjects. Zasciurinskas, in response, proceeded down Dixwell Avenue in a southerly direction and pulled his marked patrol car across the northbound lane of traffic,

seizure occurs when show of authority would lead reasonable person to believe he is not free and person submits to assertion of authority). This was not a certified question for appeal and we decline to consider it at this time.

onto the sidewalk, in front of the subjects, who then turned around and began walking in a southerly direction on Dixwell Avenue, toward Bagley and Badger. Zasciurinskas then yelled to the men to stop. The three officers surrounded the subjects, and only then did Zasciurinskas observe one of the subjects, later identified as the defendant, drop a bundle to the ground. Pursuant to Badger's instructions, the subjects were placed in a police vehicle and transported to the police substation on Charles Street. There the contents of one of the nine envelopes contained in the seized bundle tested positive for narcotics and the defendant formally was placed under arrest. A search of the defendant's person incident to his arrest resulted in the seizure of one plastic bag containing cocaine and approximately $1100 in cash. The defendant told the police that the cocaine was for his own personal use.

On the basis of these facts, the trial court determined that the defendant had been "seized for [the] purpose of investigative detention at some point before he discarded the contraband in question," and that the police officers had effected a valid stop under *Terry* v. *Ohio*, 392 U.S. 1, 21–22, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), because the officers' observations of the subjects on the sidewalk, in the vicinity of the church, sufficiently corroborated the details of the anonymous tip. Additionally, the trial court concluded that the defendant's act of turning and walking away from the officers, in a high crime area known for narcotics trafficking, provided additional support for the validity of the stop.

The defendant does not challenge the trial court's factual findings. Rather, he challenges the legal conclusion that the stop and detention effectuated in this case was supported by a reasonable and articulable suspicion, a determination that is subject to plenary review. See *State* v. *Geisler*, 222 Conn. 672, 694–95 n.15, 610 A.2d 1225 (1992). The scope of that inquiry is well

settled. "Reasonable and articulable suspicion is an objective standard that focuses not on the actual state of mind of the police officer, but on whether a reasonable person, having the information available to and known by the police, would have had that level of suspicion. . . . The police officer's decision . . . must be based on more than a hunch or speculation. . . . In justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." (Internal quotation marks omitted.) *State* v. *Trine*, 236 Conn. 216, 224–25, 673 A.2d 1098 (1996).

In the context of an anonymous tip, as in this case, a "totality of the circumstances" test is used, requiring independent police investigation to corroborate details because "[u]nlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, see *Adams* v. *Williams*, 407 U.S. 143, [146–47, 92 S. Ct. 1921, 32 L. Ed. 2d 612] (1972), 'an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity,' *Alabama* v. *White*, [496 U.S. 325, 329, 110 S. Ct. 2412, 110 L. Ed. 2d 301 (1990)]. As we have recognized, however, there are situations in which an anonymous tip, suitably corroborated, exhibits 'sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop.' Id., [327]." *Florida* v. *J. L.*, 529 U.S. 266, 270, 120 S. Ct. 1375, 146 L. Ed. 2d 254 (2000).

Therefore, the question we confront in the present case, as the Supreme Court did in *Florida* v. *J. L.*, supra, 529 U.S. 270, is whether the tip implicating the defendant had sufficient indicia of reliability. Two cases dominate this analysis. The first is *Alabama* v. *White*, supra, 496 U.S. 325, in which the United States Supreme Court examined both the extent to which police were

able to corroborate the details disclosed in the tip and the predictive nature of those details. In discussing the nature of the anonymous tip, the court was careful to point out all of the details that it contained, emphasizing, in particular, the critical importance of the tipster's ability to predict the suspect's future behavior. Id., 331–32. The court noted therein that, when the police responded to the anonymous tip that a female subject would be leaving a specific location, at a specific time, driving a Plymouth station wagon with a broken taillight, to a particular destination, and that the car would contain a brown attache case holding a significant amount of narcotics, they observed, upon arrival at the identified location, a female get into a Plymouth station wagon with a broken taillight, and drive using the most direct route to the specified destination. Id., 327. The police stopped the vehicle and, with the driver's consent, searched the car and discovered the contraband as the tip had predicted. Id.

In concluding that the stop was justified, the court emphasized the details provided in the tip and the tipster's accuracy in predicting the suspect's future behavior. "[T]he anonymous [tip] contained a range of details relating not just to easily obtained facts and conditions existing at the time of the tip, but to future actions of third parties ordinarily not easily predicted. . . . The fact that the officers found a car precisely matching the caller's description in front of the [building address given by the informant] is an example of the former. Anyone could have predicted that fact because it was a condition presumably existing at the time of the call. What was important was the caller's ability to predict [the defendant's] *future behavior*, because it demonstrated inside information—a special familiarity with [the defendant's] affairs. The general public would have had no way of knowing that [the defendant] would shortly leave the building, get in the described car, and

drive the most direct route to [the destination given by the informant]. Because only a small number of people are generally privy to an individual's itinerary, it is reasonable for police to believe that a person with access to such information is likely to also have access to reliable information about that individual's illegal activities. . . . When significant aspects of the caller's predictions were verified, there was reason to believe not only that the caller was honest but also that he was well informed, at least well enough to justify the stop." (Citations omitted; emphasis in original; internal quotation marks omitted.) Id., 332. Therefore, while acknowledging that it was "a close case," the court concluded that, "under the totality of the circumstances, the anonymous tip, as corroborated, exhibited sufficient indicia of reliability to justify the investigatory stop of [the defendant's] car." Id.

Conversely, in *Florida* v. *J. L.*, supra, 529 U.S. 274, the Supreme Court, relying on the same standards, concluded that the anonymous tip at issue therein failed to provide predictive information and was not sufficiently corroborated. In that case, an anonymous caller reported to the Miami-Dade police that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun. Id., 268. The police knew nothing about the informant. Id. Sometime after the police received the tip, two officers were instructed to respond. When the officers arrived at the bus stop, about six minutes later, they saw three black males, one of whom wore a plaid shirt, "just hanging out [there]." (Internal quotation marks omitted.) Id. The officers had no reason, apart from the tip, to suspect any of the three men of illegal conduct, the officers did not see a firearm, and the defendant made no threatening or otherwise unusual movements. Id. Nevertheless, one of the officers frisked the defendant, seizing a gun from his pocket, while "[t]he second officer frisked the other

two individuals, against whom no allegations had been made, and found nothing." Id.

The court concluded that the tip lacked the moderate indicia of reliability present and essential to the court's decision in *Alabama* v. *White*, supra 496 U.S. 332. *Florida* v. *J. L.*, supra, 529 U.S. 271. "The anonymous call concerning [the defendant] provided no predictive information and therefore left the police without means to test the informant's knowledge or credibility. That the allegation about the gun turned out to be correct does not suggest that the officers, prior to the frisks, had a reasonable basis for suspecting [the defendant] of engaging in unlawful conduct: The reasonableness of official suspicion must be measured by what the officers knew before they conducted their search. All the police had to go on in this case was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about [the defendant]. If *White* was a close case on the reliability of anonymous tips, this one surely falls on the other side of the line." Id.

Guided by the Supreme Court's decision in *White*, this court, in *State* v. *Torres*, 230 Conn. 372, 383, 645 A.2d 529 (1994), faced with an anonymous tip, looked to the totality of the circumstances surrounding the police action to determine whether the police had a reasonable and articulable suspicion to justify the stop at issue. See *State* v. *Aillon*, 202 Conn. 385, 399, 521 A.2d 555 (1987). Specifically, this court noted: "[T]he anonymous tip was telephoned to the police and relayed by a dispatcher to the arresting officer. The tip included the name of the person who would be driving the automobile, the model, year and color of the automobile, the fact that the automobile bore Massachusetts license plates, the specific destination of the automobile, and the approximate time the automobile would be passing

through the Middletown area on its way to Hartford. Every aspect of the tip was corroborated by [the state trooper] during the period before and after he stopped the defendant's car. The tip not only revealed facts in existence at the time of the call, but also predicted the defendant's future behavior, namely his destination and the approximate time of his arrival." *State* v. *Torres,* supra, 383. Accordingly, we concluded that this predictive element "was a strong indication of the reliability of the tip, 'because it demonstrated inside information—a special familiarity with [the defendant's] affairs. . . . Because only a small number of people are generally privy to an individual's itinerary, it is reasonable for police to believe that a person with access to such information is likely to also have access to reliable information about that individual's illegal activities.' *Alabama* v. *White,* [supra, 496 U.S. 332]. The high indicia of reliability of this tip combined with corroboration of innocuous facts by independent police work was sufficient to provide [the trooper] with a reasonable and articulable suspicion that the defendant was carrying the drugs indicated by the tipster." *State* v. *Torres,* supra, 383–84.

In the present case, the anonymous tip provided no predictive information, and, therefore, the police could not test the tipster's knowledge and credibility.[10] Nor could the police narrow the likely class of informants.

[10] Predicting future conduct of an alleged criminal is one way by which the police can test an anonymous informant's knowledge and credibility. There may be other features that provide the lawful basis for some police action. "For example, if an unnamed caller with a voice which sounds the same each time tells police on two successive nights about criminal activity which in fact occurs each night, a similar call on the third night ought not be treated automatically like the tip in the case now before us [that the court determined lacked the requisite indicia of reliability]. In the instance supposed, there would be a plausible argument that experience cures some of the uncertainty surrounding the anonymity, justifying a proportionate police response." *Florida* v. *J. L.,* supra, 529 U.S. 275 (Kennedy, J., concurring).

The anonymous tip came in by telephone, and the record does not reflect whether the police made any notation or other documentation either by a voice recording or by tracing the call to a telephone number.[11] Badger could not ascertain *whether* the informant personally had observed the offending conduct or, if he had, *when*. Cf. *United States* v. *Valentine*, 232 F.3d 350, 353 (3d Cir. 2000), cert. denied, 532 U.S. 1014, 121 S. Ct. 1748, 149 L. Ed. 2d 670 (2001) (officer knew that informant personally had seen conduct in issue seconds earlier).[12]

Unlike when a tip is given face-to-face, and the officer therefore has the opportunity to assess the informant's credibility and demeanor; *United States* v. *Christmas*, 222 F.3d 141, 144 (4th Cir. 2000), cert. denied, 531 U.S. 1098, 121 S. Ct. 830, 148 L. Ed. 2d 712 (2001); the tipster in the present case could not be held accountable. See *United States* v. *Salazar*, 945 F.2d 47, 50–51 (2d Cir. 1991) ("a face-to-face informant must, as a general matter, be thought more reliable than an anonymous telephone tipster, for the former runs the greater risk that he may be held accountable if his information proves false"); *United States* v. *Sierra-Hernandez*, 581 F.2d 760, 763 (9th Cir.), cert. denied, 439 U.S. 936, 99 S. Ct. 333, 58 L. Ed. 2d 333 (1978) ("[A]lthough the informant did not identify himself by name, he would have been available for further questioning if the agent had judged the procedure appropriate. Unlike a person who makes an anonymous telephone call, this informant confronted the agent directly."); *United States* v. *Gorin*,

[11] Furthermore, we note that in the present case, however, the state has provided no information about the reliability of anonymous tips in general or the reliability of this one in specific, and we have no way to know whether Badger had any objective reason to believe that this tip had some particular indicia of reliability.

[12] We reject, therefore, as without a sufficient basis in the record, the state's assertion that the record supports an inference that the anonymous caller was an eyewitness to the reported drug sales.

564 F.2d 159, 161 (4th Cir. 1977), cert. denied, 434 U.S. 1080, 98 S. Ct. 1276, 55 L. Ed. 2d 788 (1978) ("[S]tandards of reliability should not prevent appropriate police action when a victim of a crime immediately has contacted the police. . . . That same analysis applies [when a witness informs the police in person about a crime]." [Citation omitted.]). In short, the informant here was not exposed to retaliation from the suspects; he or she knew that the officers could not hold him or her accountable; and the officers could not, with any degree of certainty, assess the informant's credibility as he or she spoke,[13] did not know what the informant looked like, and had no opportunity to find the informant if the tip did not pan out.

What matters for our purposes, however, is not simply that the officers could not guarantee that they could track down the informant again. The question is whether the tip should be deemed sufficiently trustworthy in light of the total circumstances. Without a doubt, an anonymous tip can have certain other features that support reliability even if the police cannot narrow the likely class of informants. See e.g., *State* v. *Torres*, supra, 230 Conn. 383. In stark contrast to *Torres*, however, the police in this case were unable to corroborate the anonymous allegations of drug dealing on the church steps, despite their attempts to do so, and notwithstanding their close surveillance of the suspects. Rather, all they could corroborate were the "innocuous facts"; id., 384; that two black males, one taller than the other, whose clothing fit the partial description by the anonymous caller, were walking along the street in

---

[13] The state focuses on the fact that the informant, according to Badger, was "excited" when he or she telephoned the police. The record does not reflect, nor can it with any degree of accuracy, whether that exhibition of emotion was feigned or real. Regardless, that portrayal states very little about the reliability of the information, and is insufficient to support the inference advanced by the state that the informant was an eyewitness. See footnote 12 of this opinion.

the vicinity of the church, on a busy city street in the middle of the afternoon. As in *Florida* v. *J. L.*, supra, 529 U.S. 272, these so-called details added nothing to the reliability or credibility of the tip, but merely allowed the police to pinpoint the persons who were the targets of the accusation. *State* v. *Young*, 770 So. 2d 7, 11 (La. App. 2000). "Too many people fit this description for it to justify a reasonable suspicion of criminal activity." *United States* v. *Eustaquio*, 198 F.3d 1068, 1071 (8th Cir. 1999). In short, these details did not supply sufficient indicia of reliability to establish the reasonable suspicion required to justify an investigatory stop.

A police officer must be able to articulate something more than a mere "inchoate and unparticularized suspicion or 'hunch' . . . ." *Terry* v. *Ohio*, supra, 392 U.S. 27. "When a police officer testifies that a suspect aroused the officer's suspicion, and so justifies a stop and frisk, the courts can weigh the officer's credibility and admit evidence seized pursuant to the frisk even if no one, aside from the officer and defendant themselves, was present or observed the seizure. An anonymous telephone tip without more is different, however; for even if the officer's testimony about receipt of the tip is found credible, there is a second layer of inquiry respecting the reliability of the informant that cannot be pursued. If the telephone call is truly anonymous, the informant has not placed his credibility at risk and can lie with impunity. The reviewing court cannot judge the credibility of the informant and the risk of fabrication becomes unacceptable." *Florida* v. *J. L.*, supra, 529 U.S. 274–75 (Kennedy, J., concurring). Therefore, because the reliability of an anonymous tipster is "by hypothesis largely unknown, and unknowable"; *Illinois* v. *Gates*, 462 U.S. 213, 237, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983); something more, that is, greater corroboration, is required. Nothing more was present in this

case, rendering the tip, at best, conjectural and conclusory.

Two other factors are relied upon by the state to justify the Appellate Court's affirmance of the trial court's decision. The first is the characterization of the neighborhood; the second is the defendant's "flight." Although we recognize that reasonable suspicion can be based on acts capable of innocent explanation, we nevertheless conclude that, viewed in their totality, the additional circumstances cited by the state still do not support a finding of reasonable suspicion.

The issue "is not whether the particular conduct is innocent or guilty, but the degree of suspicion that attaches to particular types of noncriminal acts." (Internal quotation marks omitted.) *United States* v. *Sokolow*, 490 U.S. 1, 10, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989). The defendant in this case was seen in a high crime area known for drug trafficking. His presence on a city street in and of itself certainly does not provide suspicion to any degree, particularly when the stop occurs in the middle of the *day. United States* v. *Gray*, 213 F.3d 998, 1001 (8th Cir. 2000) (walking and then standing on street in high crime area before 10 p.m. in cold weather insufficient to justify *Terry* stop). The remaining consideration, however, upon which the state focuses—that the defendant walked away from the approaching police—"hardly amounts to the headlong flight considered in [*Illinois* v.] *Wardlaw* [528 U.S. 119, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000)] . . . ." *United States* v. *Valentine*, supra, 232 F.3d 357. Indeed, there was no flight as that term has been used in this context.

Finally, prior to the stop, there was no command to halt; *United States* v. *Weaver*, 8 F.3d 1240, 1244 (7th Cir. 1993) (noting that efforts to evade police officers' reasonable request to stop fueled their suspicions of suspect's criminal involvement); and no attempt to

destroy evidence. *United States* v. *Dupree*, 202 F.3d 1046, 1049 (8th Cir. 2000) (noting that suspect's quick movement to drop object from bridge to railroad tracks below as approaching police officer asked to speak with him sufficiently bolstered anonymous tip to justify *Terry* stop); *United States* v. *Quinn*, 83 F.3d 917, 921–22 (7th Cir. 1996) (in high crime area known for drug trafficking, failure of suspect standing with two other individuals to yield police officer's command to halt, combined with dropping of plastic baggie that appeared to contain narcotics by one of three individuals and scattering of group in opposite direction, justified *Terry* stop).

Therefore, we answer the certified question of whether the Appellate Court properly concluded that the defendant was not illegally seized in violation of the fourth amendment to the United States constitution in the negative. The concatenation of factors, even when considered collectively, did not amount to reasonable suspicion required for a valid *Terry* stop. The only issue that remains is whether that decision compels the determination that the evidence should have been suppressed as a consequence of that illegality.

"Under the exclusionary rule, evidence must be suppressed if it is found to be the fruit of prior police illegality. *Wong Sun* v. *United States*, [371 U.S. 471, 485, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963)]. All evidence is not, however, a fruit of the poisonous tree simply because it would not have been discovered but for the illegal action of law enforcement officials. Id., 487–88; see *State* v. *Villafane*, 171 Conn. 644, 655, 372 A.2d 82 (1976), cert. denied, 429 U.S. 1106, 97 S. Ct. 1137, 51 L. Ed. 2d 558 (1977), overruled in part on other grounds, *State* v. *Stepney*, 191 Conn. 233, 464 A.2d 758 (1983), cert. denied, 465 U.S. 1084, 104 S. Ct. 1455, 79 L. Ed. 2d 772, reh. denied, 466 U.S. 954, 104 S. Ct. 2163, 80 L. Ed. 2d 547 (1984). Rather, the more apt question in such a

case is whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint. *Wong Sun* v. *United States,* supra, 488, quoting Maguire, Evidence of Guilt (1959) p. 221. *State* v. *Cates,* 202 Conn. 615, 619–20, 522 A.2d 788 (1987). The initial determination is, therefore, whether the challenged evidence is in some sense the product of illegal government activity. *United States* v. *Crews,* 445 U.S. 463, 471, 100 S. Ct. 1244, 63 L. Ed. 2d 537 (1980); see also *State* v. *Miller,* 29 Conn. App. 207, 216, 614 A.2d 1229 (1992), aff'd, 227 Conn. 363, 630 A.2d 1315 (1993) ([b]ecause the seizure of the gun did not owe its origin in material part to the [illegal] *Terry* stop, the *Terry* stop cannot provide a basis for excluding the gun from evidence)." (Internal quotation marks omitted.) *State* v. *Colvin,* 241 Conn. 650, 656–57, 697 A.2d 1122 (1997).

In this case, the state does not challenge the defendant's claim that the narcotics seized and his statement to the police must be suppressed as "fruit of the poisonous tree" if the stop by the police was constitutionally impermissible. See, e.g., *State* v. *Greenfield,* 228 Conn. 62, 67, 634 A.2d 879 (1993). Without such evidence, the state could not have established the defendant's guilt.

The judgment of the Appellate Court is reversed and the case is remanded to that court with direction to reverse the judgment of the trial court and to remand the case to the trial court with direction to grant the motion to suppress.

In this opinion BORDEN and PALMER, Js., concurred.

SULLIVAN, C. J., with whom VERTEFEUILLE, J., joins, dissenting. Because I would conclude that the stop and search of the defendant, Tommy Hammond,

did not violate the fourth amendment to the United States constitution, I respectfully disagree with the majority's resolution of the first certified issue. I would, therefore, reach the second certified issue, i.e., whether the Appellate Court properly concluded that the defendant's two convictions for possession of narcotics in violation of General Statutes § 21a-279 (a) did not violate the federal and state prohibitions against double jeopardy, and I would affirm the judgment of the Appellate Court. See *State* v. *Hammond*, 60 Conn. App. 321, 759 A.2d 133 (2000).

I

INVESTIGATORY STOP

The majority cites *Florida* v. *J.L.*, 529 U.S. 266, 268, 120 S. Ct. 1375, 146 L. Ed. 2d 254 (2000), in support of its conclusion that the stop and search in this case was not justified. In *Florida* v. *J.L.*, supra, 268, the police received a tip that a young black man in a plaid shirt, standing at particular bus stop, was carrying a gun. The police went to the bus stop and found three young black men, one of whom was wearing a plaid shirt. On this basis alone, the police approached the suspect, frisked him and seized a concealed firearm. Id., 268. The tip made no predictive claims that could be used to assess its credibility, and the veracity of the tip was not verified by any of the other indicators of possible criminal activity. Id., 270. Accordingly, the investigatory stop was ruled unconstitutional. Id., 271.

At first glance, the facts in the present case seem to resemble those in *Florida* v. *J.L.*, supra, 529 U.S. 266. The police received an anonymous tip and stopped and searched the defendant on the basis of the facts that (1) he matched the general description given by the anonymous caller and (2) he was in the area indicated by the anonymous caller. In this case, however, the police had additional justification for making the stop.

See *Alabama* v. *White*, 496 U.S. 325, 329, 110 S. Ct. 2412, 110 L. Ed. 2d 301 (1990) (anonymous tip, "standing alone, would not warrant a man of reasonable caution in the belief that [a stop] was appropriate"; rather, "something more" is necessary [internal quotation marks omitted]).[1] In *Alabama* v. *White*, supra, 332, that "something more" included accurate predictions as to the suspect's future behavior, i.e., the suspect's destination. The "something more" in the present case included (1) the evasive behavior of the defendant, first, in walking away after making eye contact with one officer and, second, in turning around again when faced by another officer and (2) the fact that the area was a location known for drug sales activity. *Illinois* v. *Wardlow*, 528 U.S. 119, 124, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000), and *Florida* v. *Rodriguez*, 469 U.S. 1, 6, 105 S. Ct. 308, 83 L. Ed. 2d 165 (1984). Thus, under the totality of the circumstances standard; see *United States* v. *Cortez*, 449 U.S. 411, 417, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981); I would conclude that the facts supported a reasonable and articulable suspicion that criminal activity was afoot so as to justify an investigatory stop under *Terry* v. *Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

---

[1] In *Alabama* v. *White*, supra, 496 U.S. 326–27, the police received an anonymous tip that a certain woman would be exiting a certain apartment at a certain time, getting into a brown Plymouth station wagon with a broken right taillight, heading toward a certain motel, and transporting cocaine in a brown attache case. The police saw a woman leaving the building in question and getting into a brown station wagon with a broken right taillight. After the woman began driving in the direction of the motel, the police stopped her, told her she was suspected of transporting cocaine and asked to search her car. Id. She agreed, and the police located a brown attache case containing marijuana. Id. The United States Supreme Court held that the investigatory stop was permissible under *Terry* v. *Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), because the tip accurately predicted the specific car, point of departure, and apparent destination of the woman, all of which demonstrated inside knowledge and gave credibility to the tip. *Alabama* v. *White*, supra, 332. Accurate prediction of future behavior overcame the fact that a tip was the only indication that illegal activity was afoot. Id.

## II

## DOUBLE JEOPARDY

Because I would conclude that this case should be affirmed on the first certified issue, I would also address the second certified issue. The defendant claims that conviction on two counts of possession of narcotics violates his constitutional protection against double jeopardy. I disagree.

The defendant was found guilty of possession of cocaine in violation of § 21a-279 (a), possession of heroin in violation of § 21a-279 (a), possession of heroin with intent to sell in violation of General Statutes § 21a-277 (a), and possession of heroin with intent to sell within 1500 feet of a school in violation of General Statutes § 21a-278a (b). The trial court sentenced the defendant to four years incarceration for possession of cocaine. The trial court merged the conviction for possession of heroin into the conviction for possession of heroin with intent to sell and sentenced the defendant to twelve years to run concurrently with the sentence for possession of cocaine. Finally, the trial court sentenced the defendant to three years for possession of heroin with intent to sell within 1500 feet of a school, to run consecutively to the other sentences.

The fifth amendment protection against double jeopardy ensures that defendants are neither tried nor punished multiple times for the same offense. *Brown* v. *Ohio*, 432 U.S. 161, 165, 97 S. Ct. 2221, 53 L. Ed. 2d 187 (1977). The constitution of Connecticut incorporates the same double jeopardy prohibitions into its due process protection. *State* v. *Chicano*, 216 Conn. 699, 706, 584 A.2d 425 (1990), cert. denied, 501 U.S. 1254, 111 S. Ct. 2898, 115 L. Ed. 2d 1062 (1991).

In the present case, relying on his two convictions for possession of narcotics, the defendant invokes the

double jeopardy prohibition against multiple punishments for the same crime. The defendant relies heavily on *State* v. *Rawls*, 198 Conn. 111, 111–12, 502 A.2d 374 (1985), in which a defendant was convicted of one count of possession of cocaine and one count of possession of heroin, and sentenced to seven years incarceration on each count, with the terms to run concurrently. This court, holding that the imposition of separate penalties violated the prohibition against double jeopardy, set aside both the conviction and the sentence for possession of heroin. Id., 122.

When faced with a similar situation in *State* v. *Chicano*, supra, 216 Conn. 706, five years after *Rawls*, however, this court adopted the approach used by the Second Circuit Court of Appeals and vacated one of the sentences but allowed both convictions to stand. See also *United States* v. *Roman*, 870 F.2d 65, 75–76 (2d Cir.), cert. denied, 490 U.S. 1109, 109 S. Ct. 3164, 104 L. Ed. 2d 1026 (1989); *United States* v. *Aiello*, 771 F.2d 621, 632–33 (2d Cir. 1985). In *Chicano*, we upheld our holding in *Rawls* that the imposition of separate sentences for possession of heroin and possession of cocaine violated the prohibition against double jeopardy. We also concluded, however, that it was only necessary to vacate one of the sentences, and not the conviction itself. We then combined both convictions into a compound offense.

Applying this methodology to the present case, I would conclude that the trial court has not imposed multiple punishments for the same crime. The conviction of possession of heroin was merged into the conviction for possession of heroin with intent to sell because the former is a lesser included offense of the latter. Therefore, the defendant was convicted of possession of cocaine, possession of heroin with intent to sell, and possession of heroin with intent to sell within 1500 feet of a school. It would be improper to merge the

convictions for possession of heroin and possession of cocaine together, and then merge that conviction into possession of heroin with intent to sell because the defendant was not charged with possession of cocaine with intent to sell. Therefore, the Appellate Court properly concluded, it was possible for the defendant to commit the greater offense of possession of heroin with intent to sell without having first committed the lesser offense of possession of cocaine. *State* v. *Hammond*, supra, 60 Conn. App. 333.

Accordingly, I respectfully dissent.