## STATE OF CONNECTICUT *v.* ROBERT DAYS
(AC 25055)

Dranginis, Gruendel and Harper, Js.

Argued April 4—officially released June 28, 2005

*Annacarina Del Mastro*, assistant public defender, for the appellant (defendant).

*Nancy L. Chupak*, assistant state's attorney, with whom, on the brief, were *Jonathan C. Benedict*, state's attorney, and *Donal C. Collimore, Jr.*, assistant state's attorney, for the appellee (state).

*Opinion*

HARPER, J. The defendant, Robert Days, appeals from the judgment of conviction rendered following his conditional plea of nolo contendere[1] to one count of possession of narcotics with the intent to sell in violation of General Statutes § 21a-277 (a). The defendant claims that the court improperly denied his motion to suppress certain evidence. We affirm the judgment of the trial court.

On October 20, 2003, the defendant filed a motion to suppress items seized by officers with the Bridgeport police department after a search and seizure that occurred in Bridgeport on July 22, 2003. The defendant asserted that the police seized six "small plastic ties containing an off white rock like substance" and eleven "small white glassine folds, each bearing a stamp of a green palm tree, containing an off white powdery substance . . . ." The defendant argued that the search and seizure violated his rights under the federal and state constitutions because it was not conducted pursuant to a warrant, was not supported by probable cause and was not incident to a lawful arrest.

In November, 2003, the court conducted a hearing on the defendant's motion. The state presented testimony from Raymond Long and Orlando Rosado, police officers with the Bridgeport police department. The state also presented testimony from Christopher LaMaine, a lieutenant with the Bridgeport police department. Those witnesses were involved in the events that occurred up to and including the search and seizure

_____

[1] See General Statutes § 54-94a; Practice Book § 61-6.

at issue in the defendant's motion to suppress. The defendant presented testimony from Thomas Russell, a former police officer with expertise in narcotics transactions. On December 2, 2003, the court, in an oral ruling, denied the motion to suppress.[2]

The court ruled as follows: "[T]his court finds all the police officers' testimony to be credible as it does Thomas Russell's testimony to be credible. On July 2, 2003, at approximately 10:30 p.m., Bridgeport police officers [with] experience in drug interdiction and drug enforcement law were conducting a surveillance in the area of Claremont Avenue near Willow Street here in Bridgeport. They received information that a black male in a dark colored vehicle with dark tinted windows was coming into the area to possibly make a drug delivery. This was an area that, in their opinion, they considered to be a high drug area. They parked their car, an unmarked car, in a position to see what occurred. While conducting their surveillance, they noticed another black male standing there, who seemed to be looking around. Shortly thereafter, a dark colored Chevy sedan with dark tinted windows that matched the description entered Claremont Avenue [and] backed into [a] well lit apartment building. The officers could see the window come down on the passenger side [of the vehicle]. [The officers] observed the black male, who was on the street, hand the defendant . . . who was in the front passenger seat, what appeared to be something in his hand. It appeared to be some sort of paper or currency in exchange for items that the defendant handed to him.

"In their training and expertise, [the officers] believed that this was to be a drug transaction and, also, the court notes [that this] belief is consistent with the testimony of Investigator Russell that the buyer in a case

[2] The court subsequently signed a transcript of its ruling, thereby bringing its decision into compliance with Practice Book § 64-1.

like this will often try to hide the money in a small place. So, what was happening there was consistent with both what the officers said and what Investigator Russell noted as a drug transaction.

"At this point, the officers had a reasonable and articulable suspicion that a crime had just occurred. They then radioed to their other people who were in the area to stop the vehicle. The vehicle then turned down Willow Street. At that point, the other officers stopped the vehicle. The officers advanced to the car. They were able to see, they could see and they did see through the windshield [that] the defendant had what appeared to be plastic bags of narcotics that he was putting down his pants.

"This is, in the eyes of the court, also completely common sense, because the officer . . . [was] trained on using his eyes for his own safety, and his eyes would be focused on the hands of the defendant. And then when he saw what appeared to be narcotics, the case then ripened into—in plain view of the officer at that point—it ripens into probable cause both for the arrest and the subsequent search.

"So, therefore, the court finds that . . . there was a reasonable and articulable suspicion to stop the car. It was then through plain view sufficient evidence for probable cause to make the arrest and the search. The motion to suppress is denied."

The defendant claims that the court improperly denied his motion to suppress because the search and seizure violated the rights afforded him by article first, §§ 7[3] and 9,[4] of the constitution of Connecticut. The

---

[3] Article first, § 7, of the constitution of Connecticut provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

[4] Article first, § 9, of the constitution of Connecticut provides: "No person shall be arrested, detained or punished, except in cases clearly warranted by law."

defendant takes issue with certain of the court's factual determinations, the court's conclusion that the police lawfully stopped the vehicle in which he was a passenger, and the court's conclusion that the subsequent search and seizure was lawful because it was incidental to a lawful arrest.

"Our review of the defendant's claim is governed by well established principles. Under the exclusionary rule, evidence must be suppressed if it is found to be the fruit of prior police illegality. . . . On appeal, we apply a familiar standard of review to a trial court's findings and conclusions in connection with a motion to suppress. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . . Because a trial court's determination of the validity of a . . . search [or seizure] implicates a defendant's constitutional rights, however, we engage in a careful examination of the record to ensure that the court's decision was supported by substantial evidence. . . . However, [w]e [will] give great deference to the findings of the trial court because of its function to weigh and interpret the evidence before it and to pass upon the credibility of witnesses." (Citations omitted; internal quotation marks omitted.) *State* v. *Reynolds*, 264 Conn. 1, 42–43, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004).

I

## CHALLENGES TO THE COURT'S FINDINGS OF FACT

We first turn to the defendant's challenges to factual determinations that underlie the court's decision. The defendant argues that there was no evidence to support

the court's finding that the police had received information that "a black male in a dark colored vehicle with dark tinted windows was coming into the area [under police surveillance] to possibly make a drug delivery." Our review of the evidence reveals that during direct examination by the state, Rosado testified that he had received information from a source on July 22, 2003, "that a drug delivery might be happening" in the area "near Willow and Claremont." Rosado testified that police "received information about a dark colored vehicle coming into the area that was possibly making a delivery." During cross-examination, the defendant's attorney asked Rosado whether he had received information concerning a "black male" and whether police "were looking for a dark colored car with dark tinted windows." Rosado replied affirmatively. Accordingly, this evidentiary challenge to the court's findings is without merit.

The defendant also claims that "the trial court erroneously found that . . . LaMaine saw [him] putting plastic bags of narcotics down his pants." The defendant mischaracterizes the court's factual determination. The court found that upon approaching the defendant's vehicle on Willow Street, police officers "did see through the windshield [that] the defendant had *what appeared to be* plastic bags of narcotics that he was putting down his pants." (Emphasis added.) LaMaine testified that at about 10:30 p.m. on July 22, 2003, he was in an unmarked police vehicle in the area of the defendant's arrest, working in conjunction with Long and Rosado. LaMaine testified that he received information from Long and Rosado that the drug transaction they had been waiting for had taken place. Long and Rosado notified LaMaine that "a black Lumina [automobile], with tinted windows," which contained the suspects, was traveling in his direction. LaMaine further testified that when he observed a vehicle matching that description, what he

described as the only vehicle in the area, he and other officers "boxed" the vehicle in with their vehicles while it was stopped at a traffic signal.

LaMaine testified that he observed two people in the vehicle, the defendant and a driver. LaMaine further testified: "I approached [the vehicle] from the front. And, as I said, I blocked the front of their vehicle. And through the windshield I could see both the driver and the front seat passenger shoving plastic bags down the front of their pants." At that point, according to LaMaine, he and another officer, whom he identified as Officer Reilly, removed the defendant from the vehicle. LaMaine testified: "Officer Reilly immediately started to pat down for weapons. I quietly told Officer Reilly that I saw [the defendant] shove the bag down the front of his pants. He simultaneously told me, 'Yes, I feel it.' And we then, together, handcuffed [the defendant] and placed him under arrest." LaMaine recalled that Reilly subsequently removed "a plastic bag" from the front of the defendant's pants. LaMaine also testified that another officer simultaneously was removing the driver from the vehicle, and that he walked around the vehicle and told that officer that he observed the driver "put the drugs down his pants."

The court heard testimony that LaMaine and his fellow officers approached the defendant's vehicle in pursuit of a drug dealer. LaMaine testified that during his career, he had "made over a thousand narcotic arrests and witnessed another thousand, at least." The evidence demonstrates that when LaMaine approached the vehicle, he observed the defendant and the driver doing the same thing: Putting bags down the front of their pants. LaMaine told another officer that the driver had "put the drugs down his pants." It was not unreasonable for the court to infer that LaMaine, on the basis of his expertise in drug related arrests as well as his knowledge of the events that immediately preceded his obser-

vation of the vehicle's occupants, perceived that the defendant had done the same. Accordingly, we conclude that the court's finding, that one or more officers "did see through the windshield [that] the defendant had what appeared to be plastic bags of narcotics that he was putting down his pants," is supported by the evidence and the reasonable inferences drawn therefrom.

## II

## THE INVESTIGATORY DETENTION

In determining that the search and seizure was lawful, the court first concluded that at the time that police officers stopped the vehicle in which the defendant was a passenger, the officers had a reasonable and articulable suspicion that one or more persons in the vehicle had engaged in criminal activity. Accordingly, the court concluded that the officers lawfully stopped the vehicle.

The defendant claims that he was seized illegally by the officers when they came upon the vehicle in which he was a passenger. "[A] person [is defined] as seized under our state constitution when by means of physical force or a show of authority, his freedom of movement is restrained. . . . In determining whether a seizure has occurred, so as to invoke the protections of our state constitution . . . a court is to consider whether in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." (Internal quotation marks omitted.) *State* v. *Donahue*, 251 Conn. 636, 642–43, 742 A.2d 775 (1999), cert. denied, 531 U.S. 924, 121 S. Ct. 299, 148 L. Ed. 2d 240 (2000). The court explicitly found that the police lawfully stopped the vehicle, and the court implicitly found that a seizure had occurred at that point.

"Under the fourth amendment to the United States constitution, and under article first, [§§ 7 and 9] . . . of the Connecticut constitution, a police officer may briefly detain an individual for investigative purposes if the officer has a reasonable and articulable suspicion that the individual has committed or is about to commit a crime." (Internal quotation marks omitted.) *State* v. *Clark*, 255 Conn. 268, 281, 764 A.2d 1251 (2001). "Any inquiry into the permissible justification for, and boundaries of, a particular investigatory detention . . . is necessarily factbound. . . . Reasonable and articulable suspicion is an objective standard that focuses not on the actual state of mind of the police officer, but on whether a reasonable person, having the information available to and known by the police, would have had that level of suspicion. . . . The police officer's decision . . . must be based on more than a hunch or speculation. . . . In justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." (Citations omitted; internal quotation marks omitted.) *State* v. *Trine*, 236 Conn. 216, 224–25, 673 A.2d 1098 (1996). "[R]easonable and articulable suspicion is . . . based not on the officer's inchoate and unparticularized suspicion or hunch, but [on] the specific reasonable inferences which he is entitled to draw from the facts in light of his experience. . . . What constitutes a reasonable and articulable suspicion depends on the totality of the circumstances." (Internal quotation marks omitted.) *State* v. *Hernandez*, 87 Conn. App. 464, 470, 867 A.2d 30, cert. denied, 273 Conn. 920, 871 A.2d 1030 (2005).

On the basis of the court's findings, we conclude that the court properly concluded that the officers lawfully seized the defendant for purposes of an investigatory detention when they surrounded the vehicle in which

he was a passenger. The court found that the police had received predictive information[5] that a black male in a dark colored vehicle with tinted windows was going

[5] The defendant argues that a reasonable and articulable suspicion did not exist because the information received by police could not have formed the basis of such a degree of suspicion. The defendant argues that the present case is similar to *State* v. *Hammond*, 257 Conn. 610, 778 A.2d 108 (2001), in which our Supreme Court held that police, acting on the basis of an anonymous tip, illegally seized a defendant to investigate criminal activity. In *Hammond*, police received a telephone call from an anonymous caller who complained of drug related activity at a specific location in an area known for its drug related activity. Id., 615. The caller provided the police with a partial description of individuals engaged in the criminal activity of which she complained, describing their gender, skin color and the color of the coats that they were wearing. Id. On the basis of the information, a patrol officer went to the location and observed two individuals matching the description provided by the caller. Id. Patrol officers approached the individuals, who were observed walking away from the police, surrounded them and ultimately ordered them to stop. Id., 616. Officers surrounded the defendant, who was one of the individuals, and observed him drop a bundle to the ground. Id. Police took the defendant and the other individual into custody and determined that the bundle contained narcotics. Id.

The defendant later moved to suppress the narcotics that the police seized, arguing that the narcotics were the fruit of an illegal stop. Id., 613. The trial court denied the motion to suppress, concluding that the police had detained the defendant legally for the purpose of an investigative detention. Id., 616. Our Supreme Court reversed the defendant's conviction after concluding that the police did not have a reasonable and articulable suspicion that he had engaged in criminal activity. Id., 626. The court observed that the informant was unknown to police and that police were unaware of her basis of knowledge concerning the information provided to police. Id., 621–22. The court further concluded that in those circumstances, the police did not conduct sufficient investigation to determine whether the information was trustworthy. Id., 623. The court explained: "[T]he police in this case were unable to corroborate the anonymous allegations of drug dealing . . . despite their attempts to do so, and notwithstanding their close surveillance of the suspects. Rather, all they could corroborate were the 'innocuous facts' . . . that two black males, one taller than the other, whose clothing fit the partial description by the anonymous caller, were walking . . . on a busy city street in the middle of the afternoon." (Citation omitted.) Id., 623–24. The court concluded that the police investigation did nothing more than pinpoint the targets of the accusation; it did not corroborate the allegation of criminal activity. Id., 624. The court also concluded that the police allegation that the defendant and his acquaintance walked away as police approached did not constitute evidence of flight. Id., 625. Finally, the court concluded that, prior to the investigatory detention, the police had not ordered the individuals to stop. Id.

to be in a specific place for the purpose of making a drug delivery. Police conducted surveillance at night at that place, which was in an area known to police to be high in incidents of drug related crimes. Undercover officers first observed an individual "who seemed to be looking around." A vehicle matching the description of that provided by the informant approached. Officers observed the vehicle back into an area near an apartment building. The window on the passenger side of the vehicle came down, and the individual who had been loitering approached the vehicle and participated in an exchange with the defendant, who was sitting in the passenger seat. The officers observed the individual hand the defendant "some sort of paper or currency in exchange for items that the defendant handed to him." Officers intercepted the vehicle soon after it traveled away from the scene.

The defendant argues in relevant part: "The court erred in concluding that what the officers *believed* they

---

We conclude that the present case is distinguishable from *Hammond* in several material respects. First, although the court in the present case did not make detailed findings with regard to the source who provided information to the police, the state witnesses did not refer to the informant as an anonymous source, but as a confidential informant. Second, the informant in the present case provided predictive information to the police, she did not merely complain about illegal activity. Third, the officers in the present case did not detain the defendant upon observing him at the location described by the informant. Instead, the police conducted an investigation that corroborated the information provided by the informant. See *State* v. *Torres*, 230 Conn. 372, 383–84, 645 A.2d 529 (1994) (holding that police investigation corroborating predictive information including anonymous tip was sufficient to provide police with reasonable, articulable suspicion that defendant had engaged in criminal activity). The officers in the present case did not witness or corroborate merely innocuous facts; they observed facts that reasonably were consistent with criminal activity, a drug related transaction. Police efforts in verifying information provided by an informant may help establish an informant's basis of knowledge and verify his or her reliability. *State* v. *Smith*, 257 Conn. 216, 226, 777 A.2d 182 (2001). Accordingly, we disagree that the present case is analogous to *Hammond* and reject that aspect of the defendant's claim.

saw was sufficient to support a reasonable and articulable suspicion to investigate [him]. . . . Essentially, the court determined [that] the stop was legally justified based on nothing more than the officers' *speculation* that a drug transaction had occurred." (Emphasis in original.) That argument disregards the facts that the police officers received predictive information, conducted surveillance and witnessed a hand-to-hand transaction that was consistent with a drug related transaction. It is clear, therefore, that the officers did not stop the defendant on the basis of mere speculation that criminal activity may have been afoot.

The defendant further argues that "the trial court should have only considered *what Officers Long and Rosado knew at the time of their observations*" in evaluating whether there was a basis for the investigatory stop. (Emphasis in original.) According to the defendant, the officers presumably knew only that some type of transaction or interaction had occurred between somebody in the vehicle in which the defendant was a passenger and the individual standing near the apartment building. The defendant argues that the transaction did not appear to be unlawful or suspicious.

That argument is flawed because in evaluating whether a reasonable and articulable suspicion exists, the court is permitted to examine all of the circumstances known to police *as well as any rational inferences to be drawn therefrom.* The quantum of proof is not the quantum of proof necessary either to arrest or to convict; the point of an investigatory detention merely is to permit investigation of criminal activity that may be afoot. Given the nature of the predictive information and the fact that the defendant's behavior occurred at night in an area known for drug related activity, it was not unreasonable for the police to infer that the defendant's conduct was not innocuous, but was consistent

with a drug related transaction.[6] The fact that an innocuous explanation for the conduct observed may have existed is of no consequence to our analysis when, as here, there was a reasonable basis for the police to suspect criminal activity. "Suspicious activity, by its very nature, is equivocal and ambiguous." *State* v. *Williamson*, 10 Conn. App. 532, 542, 524 A.2d 655, cert. denied, 204 Conn. 801, 525 A.2d 965 (1987). "The possibility of an innocent explanation does not deprive the officers of the capacity to entertain a reasonable suspicion of criminal conduct." (Internal quotation marks omitted.) *State* v. *Jennings*, 19 Conn. App. 265, 269, 562 A.2d 545, cert. denied, 212 Conn. 815, 565 A.2d 537 (1989). Accordingly, we conclude that the court properly concluded that the stop of the vehicle was a lawful investigatory stop.

## III

## SEARCH INCIDENT TO A LAWFUL ARREST

After concluding that the police officers lawfully stopped the defendant, the court concluded that when LaMaine observed the defendant and the vehicle's driver putting bags down the front of their pants, the officers had probable cause to arrest the defendant without a warrant. Accordingly, the court concluded that the subsequent search and seizure by the officers was incident to a lawful arrest. The defendant challenges the court's conclusion that the officers had probable cause to arrest him at the time that they searched him and seized the narcotics.

---

[6] The defendant also argues that the court improperly relied on the testimony of his expert witness, Russell, in determining whether the police had a reasonable and articulable suspicion to justify the seizure. Contrary to the defendant's claim, it is readily apparent from our review of the court's decision that the court did not rely on Russell's testimony to determine whether Long and Rosado had witnessed a drug transaction. Instead, the court referred to Russell's testimony in its task of evaluating the testimony of Long and Rosado. That was not improper.

Our state constitution affords greater protection against illegal searches and seizures than does the federal constitution. *State* v. *Oquendo*, 223 Conn. 635, 649–50, 613 A.2d 1300 (1992). "Our [state] constitutional preference for warrants reflects a goal of protecting citizens from unjustified police intrusions by interposing a neutral decisionmaker between the police and the object of the proposed search. . . . Accordingly, a search is invalid if the police, without a justification rooted in a valid exception to the warrant requirement, have relied upon only their own probable cause evaluation, even if later found to be correct, before searching." (Citations omitted.) *State* v. *Miller*, 227 Conn. 363, 382–83, 630 A.2d 1315 (1993). "Under the state constitution, all warrantless searches, whether or not the police have probable cause to believe that a crime was committed, are per se unreasonable, unless they fall within one of a few specifically established and well delineated exceptions to the warrant requirement." *State* v. *Joyce*, 229 Conn. 10, 24–25, 639 A.2d 1007 (1994).

"It is well established . . . that a warrant is not required when a search is conducted incident to a lawful custodial arrest. . . . When an arrest is made, it is reasonable for a police officer to search for, and seize, any weapons or evidence within the immediate control of the arrested person in order to ensure officer safety and prevent the destruction or concealment of evidence. . . .

"In order for a warrantless felony arrest to be valid, it must be supported by probable cause. . . . The determination of whether probable cause exists under the fourth amendment to the federal constitution, and under article first, § 7, of our state constitution, is made pursuant to a totality of circumstances test. . . . Probable cause exists when the facts and circumstances within the knowledge of the officer and of which he has reasonably trustworthy information are sufficient

in themselves to warrant a man of reasonable caution to believe that a felony has been committed. . . . The probable cause test then is an objective one. . . .

"We consistently have held that [t]he quantum of evidence necessary to establish probable cause exceeds mere suspicion, but is substantially less than that required for conviction. . . . The existence of probable cause does not turn on whether the defendant could have been convicted on the same available evidence. . . . [P]roof of probable cause requires less than proof by a preponderance of the evidence. . . . Probable cause, broadly defined, comprises such facts as would reasonably persuade an impartial and reasonable mind not merely to suspect or conjecture, but to believe that criminal activity has occurred. . . . The probable cause determination is, simply, an analysis of probabilities. . . . The determination is not a technical one, but is informed by the factual and practical considerations of everyday life on which reasonable and prudent [persons], not legal technicians, act. . . . Probable cause is not readily, or even usefully, reduced to a neat set of legal rules. . . . Reasonable minds may disagree as to whether a particular [set of facts] establishes probable cause. . . .

"In reviewing a trial court's determination that probable cause to arrest existed, we consider whether [it is] legally and logically correct and whether [it] find[s] support in the facts set out in the memorandum of decision . . . . Because a trial court's determination of the existence of probable cause implicates a constitutional claim, we must review the record carefully to ensure that its determination [is] supported by substantial evidence." (Citations omitted; internal quotation marks omitted.) *State* v. *Clark*, supra, 255 Conn. 291–94.

We conclude, on the basis of our review of the record, that LaMaine had probable cause to arrest the defendant

for possession of narcotics before the officers seized the narcotics from the defendant's pants. The information known to LaMaine prior to the search and seizure would warrant a person of reasonable caution to believe that a felony had been committed. In part II, we set forth the facts known to the police, which formed the basis of a reasonable and articulable suspicion to conduct an investigatory stop of the vehicle in which the defendant was a passenger. LaMaine's subsequent observations when approaching the vehicle transformed police suspicion of criminal activity into probable cause that a felony had been committed by the defendant.

The court found that as the officers approached the stopped vehicle, they "did see through the windshield [that] the defendant had what appeared to be plastic bags of narcotics that he was putting down his pants." The court found that the defendant's conduct occurred in "plain view" of the officers.[7] This is not a close case. A reasonable person would be hard pressed to classify that conduct as anything other than evidence that the defendant was attempting to conceal *something* from the police officers who were approaching the vehicle.[8]

---

[7] The defendant argues that the court improperly relied on the plain view doctrine in concluding that the officers had probable cause to arrest him. He argues that the court improperly relied on that doctrine because at the time that the officers observed the defendant's actions in the vehicle, they had no way of knowing what was in the bags he was putting down his pants. Under the plain view doctrine, *evidence of an incriminating character* may be seized without a search warrant in well delineated circumstances. See *State* v. *Krause*, 163 Conn. 76, 81–84, 301 A.2d 234 (1972); *State* v. *Blackwell*, 20 Conn. App. 193, 199–200, 565 A.2d 549, cert. denied, 213 Conn. 810, 568 A.2d 794 (1989). The defendant's argument rests on a misinterpretation of the court's decision. The court unambiguously stated that the defendant's actions in putting bags of what the police believed to be narcotics down his pants occurred "in plain view of the officer . . . ." The court's mere use of the term "plain view" did not indicate that it relied on the plain view doctrine in this case.

[8] The defendant argues that the police observations of the transaction that occurred prior to his arrest, as well as LaMaine's observations of the defendant's actions when he approached the vehicle, could not form the basis of probable cause. The defendant argues that Long and Rosado did

A reasonable person would likely conclude that it was probable that the defendant was not concealing something lawfully possessed by him, but that he was concealing narcotics. That the defendant and the driver of the vehicle were engaging in that furtive conduct, at the same time, shortly after police observed them engage in conduct that both matched the predictive information provided by an informant, and afforded the police a reasonable and articulable suspicion that a drug related crime had been committed, leads us to conclude that the totality of circumstances abundantly afforded the police probable cause to arrest the defendant. We conclude that the arrest was supported by probable cause and that the record contains substantial evidence that the search of the defendant's pants was integral to the arrest.

The search of the defendant and the seizure of the narcotics he endeavored to conceal from the officers did not violate our state constitution.[9] Accordingly, we conclude that the court properly denied the defendant's motion to suppress.

The judgment is affirmed.

In this opinion the other judges concurred.

not observe what was exchanged, and that LaMaine's "mere observation of a sandwich bag, without seeing the contents, cannot be enough to support probable [cause]. . . . A sandwich bag, by its nature, is not incriminating." The defendant suggests by that argument that the court was bound to afford the observations and facts known to the police only benign interpretations inconsistent with a belief that he had engaged in criminal activity. Probable cause is not based on mere observations of conduct; it is "drawn by an act of judgment formed in light of the particular situation and with account taken of all the circumstances." (Internal quotation marks omitted.) *State v. Reynolds*, supra, 264 Conn. 46. Here, the court properly viewed the observations of the officers in the light of the information and circumstances known to them on the evening of July 22, 2003, and reasonably concluded that the observations and the reasonable view thereof afforded an ample basis for probable cause to arrest the defendant.

[9] The defendant also argues that a patdown search of him by the officers was improper because they did not reasonably believe that he was armed and dangerous. Because we conclude that the police searched the defendant incident to a lawful arrest, we need not address that claim.