STATE OF CONNECTICUT *v.* TERRY T. JOHNSON
(SC 17939)

Rogers, C. J., and Katz, Vertefeuille, Zarella and Schaller, Js.

Argued November 26, 2007—officially released April 15, 2008

*Jon L. Schoenhorn*, for the appellant (defendant).

*Mitchell S. Brody*, senior assistant state's attorney, with whom, on the brief, were *Scott J. Murphy*, state's attorney, and *Brett Salafia*, assistant state's attorney, for the appellee (state).

*Opinion*

VERTEFEUILLE, J. The defendant, Terry T. Johnson, appeals from the judgment of conviction, rendered after a jury trial, of one count each of the crimes of attempted sale of narcotics in violation of General Statutes §§ 21a-

278 (b) and 53a-49, possession of narcotics with intent to sell in violation of § 21a-278 (a), and possession of narcotics in violation of General Statutes § 21a-279 (a). On appeal, the defendant claims that the trial court improperly: (1) violated the federal and state constitutions by denying the defendant's motion to suppress evidence obtained as a result of a search incident to a warrantless arrest that had been made without probable cause; and (2) restricted the defendant's constitutional rights by erroneously instructing the jury to disregard proper closing arguments. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. On October 27, 2004, the New Britain police department arrested a man named Curtis Thornton for various narcotics offenses. Following his arrest, Thornton spoke with Officer Frank Bellizzi, an eight year veteran of the New Britain police department. During the course of their conversation, Thornton offered to provide Bellizzi with the name of the individual from whom Thornton previously had purchased narcotics in exchange for leniency in the form of future court or bond consideration. Once an informant offers to provide such information, it is the practice of the New Britain police department to assess his credibility and the reliability of his information. In an effort to make this assessment, Bellizzi questioned Thornton about topics such as "weights and measurements and costs" of drugs.[1] After this discussion, Bellizzi concluded that Thornton "knew what he was talking about . . . ."

[1] On cross-examination, Bellizzi noted that when assessing an informant's credibility he usually considers three things: (1) whether the informant had made a declaration against his penal interest; (2) whether he or a fellow officer previously had dealt with the informant; and (3) whether he or a fellow officer believed the informant to be credible. Although Thornton admitted to having purchased drugs previously from the defendant, because Thornton did not provide the officer with specific dates and times of these occurrences, Bellizzi testified that this admission did not constitute a declaration against penal interest. Specifically, Bellizzi noted that he could not have

Thornton then provided Bellizzi with a physical description of the defendant as his narcotics supplier. Thornton described this individual, from whom he had often purchased crack cocaine in front of the apartment building at 188 Allen Street in New Britain, as a tall, thin African-American male in his mid-twenties who usually wore a New York Yankees baseball cap. Thornton also noted that the defendant, whom he knew as "Bird," drove a gray or silver Saab.

At approximately 6:20 p.m. on October 27, 2004, at Bellizzi's direction, Thornton called the defendant from the police station on his cellular telephone in order to arrange a meeting for purposes of purchasing drugs. Bellizzi observed that the telephone number that Thornton had called matched the number Thornton previously had told Bellizzi belonged to the defendant. Bellizzi also observed Thornton during the course of Thornton's conversation with the defendant. Bellizzi testified that he heard Thornton ask for two and one-quarter ounces of cocaine, discuss the dollar amount related to a sale for that quantity, and mention the amount of money Thornton owed the defendant for prior drug purchases. After placing the telephone call, Thornton informed Bellizzi that the defendant had agreed to deliver two and one-quarter ounces of cocaine shortly thereafter in the parking lot in front of 188 Allen Street, one of three multifamily apartment buildings in a complex where Thornton and the defendant previously had met to conduct drug transactions. Bellizzi relayed this information, along with Thornton's physical description of the defendant, to police officers who had arrived in unmarked police cars in the parking lot in

"done a warrant" for Thornton based on the information provided. Regarding the other prongs of credibility assessment, Bellizzi had not dealt with Thornton previously, but did believe him to be credible. Thus, Bellizzi conceded that he was able to satisfy only one of the three tests he typically uses for assessing whether an informant is reliable.

front of the apartment buildings at 188, 190 and 192 Allen Street. In Bellizzi's presence, Thornton telephoned the defendant a second time at approximately 6:40 p.m., and the defendant confirmed that he was en route to the Allen Street meeting place, and that he would arrive shortly. Bellizzi then relayed this information to the officers who were present at the Allen Street location.

At approximately 7:10 p.m., a gray Saab occupied by two men[2] drove into the parking lot at 188 Allen Street, "looped around" the lot, and parked in front of that address. The driver of the automobile, a black male who was wearing a New York Yankees cap, matched the description that Bellizzi previously had relayed to the officers at the scene. The officers drove their police vehicles up to the Saab and encircled it so that it could not leave the scene. The officers then removed the defendant, who was driving the automobile, handcuffed him, and placed him under arrest.[3] After his arrest, police searched the defendant and found $363 and two and one-quarter ounces of crack cocaine in his pockets. During the booking procedure at police headquarters, the police found an additional 0.6 grams of crack cocaine in the defendant's coat pocket. Additionally, a search of the Saab's interior revealed a cellular telephone in the front seat that, it was determined, had received calls from Thornton's cellular telephone earlier that day.

The following procedural history also is necessary for our resolution of this appeal. The defendant was charged, in an information dated October 27, 2004, with one count each of possession of a narcotic substance

---

[2] A passenger in the automobile, who police later determined was not involved in the drug transaction, was allowed to leave the scene.

[3] We note that although the driver was later identified as the defendant, it is not clear from the record whether Thornton himself made this identification.

in violation of § 21a-279 (a), criminal attempt to sell narcotics in violation of §§ 53a-49 and 21a-278 (b), and possession of more than one-half gram of crack cocaine with intent to sell in violation of § 21a-278 (a). On May 10, 2005, the trial court, *Cronan, J.*, conducted a hearing on the defendant's motion to suppress evidence, and later denied the motion. A subsequent jury trial resulted in a guilty verdict on all counts, and the trial court, *Vitale, J.*, thereafter rendered judgment in accordance with the jury verdict, sentencing the defendant to an effective sentence of twenty years imprisonment, suspended after twelve years, and three years probation. The defendant appealed from the judgment of conviction to the Appellate Court, and we transferred the case from the Appellate Court to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

I

The defendant first claims that the trial court improperly denied his motion to suppress the evidence seized in violation of his rights under the federal and state constitutions. We will begin with the defendant's claim under the federal constitution.

We first set forth the applicable standard of review. "Whether the trial court properly found that the facts submitted were enough to support a finding of probable cause is a question of law. . . . The trial court's determination on the issue, therefore, is subject to plenary review on appeal." (Citation omitted.) *State* v. *Clark*, 255 Conn. 268, 279, 764 A.2d 1251 (2001).

A

We first consider the defendant's claim that the trial court improperly denied his motion to suppress in viola-

tion of the fourth[4] and fourteenth amendments to the federal constitution. The defendant contends that the police lacked probable cause to arrest him without a warrant moments after he drove into the parking lot at 188 Allen Street, and that the search of his person and vehicle, and the discovery of narcotics and other items of evidentiary interest, incident to this arrest, violated his federal constitutional rights. The state claims that under the "totality of the circumstances," the state had probable cause to effectuate a warrantless arrest of the defendant and, therefore, that police complied with federal constitutional strictures in arresting the defendant. We agree with the state.

"The [f]ourth [a]mendment to the United States constitution protects the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search and seizures. Ordinarily, police may not conduct a search unless they first obtain a search warrant from a neutral magistrate after establishing probable cause. [A] search conducted without a warrant issued upon probable cause is per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions. . . . These exceptions have been jealously and carefully drawn . . . and the burden is on the state to establish the exception." (Citations omitted; internal quotation marks omitted.) *State* v. *Badgett*, 200 Conn. 412, 423–24, 512 A.2d 160, cert. denied, 479 U.S. 940, 107 S. Ct. 423, 93 L. Ed. 2d 373 (1986). One such exception is the seizure of evidence incident to a lawful arrest. *New*

---

[4] The fourth amendment to the United States constitution, which was made applicable to the states through the due process clause of the fourteenth amendment in *Wolf* v. *Colorado*, 338 U.S. 25, 28, 69 S. Ct. 1359, 93 L. Ed. 1782 (1949), provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

*York* v. *Belton*, 453 U.S. 454, 101 S. Ct. 2860, 69 L. Ed. 2d 768 (1981); *United States* v. *Robinson*, 414 U.S. 218, 94 S. Ct. 467, 38 L. Ed. 2d 427 (1973).

"In order for a warrantless felony arrest to be valid, it must be supported by probable cause. . . . We consistently have held that [t]he quantum of evidence necessary to establish probable cause exceeds mere suspicion, but is substantially less than that required for conviction. . . . The existence of probable cause does not turn on whether the defendant could have been convicted on the same available evidence. . . . [P]roof of probable cause requires less than proof by a preponderance of the evidence. . . . Probable cause, broadly defined, comprises such facts as would reasonably persuade an impartial and reasonable mind not merely to suspect or conjecture, but to believe that criminal activity has occurred. . . . The probable cause determination is, simply, an analysis of probabilities. . . . The determination is not a technical one, but is informed by the factual and practical considerations of everyday life on which reasonable and prudent [persons], not legal technicians, act. . . . Probable cause is not readily, or even usefully, reduced to a neat set of legal rules. . . . Reasonable minds may disagree as to whether a particular [set of facts] establishes probable cause." (Citations omitted; internal quotation marks omitted.) *State* v. *Clark*, supra, 255 Conn. 292–93.

"The determination of whether probable cause exists under the fourth amendment to the federal constitution . . . is made pursuant to a totality of circumstances test. *State* v. *Velasco*, 248 Conn. 183, 189–90, 728 A.2d 493 (1999), citing *Illinois* v. *Gates*, 462 U.S. 213, 231–32, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983); see also *State* v. *Barton*, 219 Conn. 529, 544–45, 594 A.2d 917 (1991). Probable cause exists when the facts and circumstances within the knowledge of the officer and of which he has reasonably trustworthy information are sufficient

in themselves to warrant a man of reasonable caution to believe that a felony has been committed. . . . The probable cause test then is an objective one." (Citations omitted; internal quotation marks omitted.) *State* v. *Clark*, supra, 255 Conn. 292.

The totality of the circumstances test was adopted under the federal constitution in 1983, when the United States Supreme Court rejected the previous two-pronged *Aguilar-Spinelli* test, derived from the United States Supreme Court's decisions in *Aguilar* v. *Texas*, 378 U.S. 108, 84 S. Ct. 1509, 12 L. Ed. 2d 723 (1964), and *Spinelli* v. *United States*, 393 U.S. 410, 89 S. Ct. 584, 21 L. Ed. 2d 637 (1969), which "provided a method for evaluating the existence of probable cause when an arrest or search warrant affidavit was based upon information supplied to the police by a confidential informant. Under the *Aguilar-Spinelli* test, the trial court was required to make two determinations: (1) whether the informant's veracity or reliability was established; and (2) whether there was a basis for the informant's knowledge regarding the information supplied." *State* v. *Velasco*, supra, 248 Conn. 190.

In 1983, "[i]n *Illinois* v. *Gates*, supra, 462 U.S. 213, the United States Supreme Court recognized an underlying flaw in the application of the *Aguilar-Spinelli* analysis. Specifically, the court noted that courts and commentators had regarded the two prongs of the *Aguilar-Spinelli* test to be entirely independent of each other, and each necessary to a finding of probable cause. As a result, courts had struggled to formulate rules regarding what types of information and what types of independent police corroboration might satisfy each of the prongs. Id., 229 n.4 . . . . The court reasoned that the elaborate set of legal rules that had resulted from this emphasis on the independent character of the two prongs had led courts to dissect evidence relating to probable cause in an excessively technical manner.

Consequently, the court abandoned the *Aguilar-Spinelli* approach. [Id., 236–38.]" (Citation omitted.) *State v. Velasco*, supra, 248 Conn. 191. In place of the *Aguilar-Spinelli* approach, the Supreme Court adopted the totality of the circumstances approach, which, the court noted, was more consistent with the court's prior treatment of probable cause. *Illinois* v. *Gates*, supra, 230–31. Probable cause, the *Gates* court noted, was "a practical, nontechnical conception" that is "a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." (Internal quotation marks omitted.) Id., 231–32.

In rejecting the *Aguilar-Spinelli* approach, the *Gates* court declined to dispense entirely with the two-pronged approach for assessing probable cause under the federal constitution. Instead, the court held that the two previously independent prongs "are better understood as relevant considerations in the totality-of-the-circumstances analysis that traditionally has guided probable-cause determinations: a deficiency in one may be compensated for, in determining the overall reliability of the tip, by a strong showing as to the other, or by some other indicia of reliability." Id., 233. This court also has noted that the *Aguilar-Spinelli* prongs "should be regarded as closely intertwined issues that may usefully illuminate the common-sense, practical question of the existence of probable cause . . . ." (Internal quotation marks omitted.) *State* v. *Respass*, 256 Conn. 164, 175, 770 A.2d 471, cert. denied, 534 U.S. 1002, 122 S. Ct. 478, 151 L. Ed. 2d 392 (2001). The totality of the circumstances approach adopted in *Gates* remains the standard for assessing probable cause under the federal constitution today. In the present case, we conclude that probable cause existed for the defendant's arrest under the totality of the circumstances.

The first factor supporting an inference of the informant's reliability or veracity is the fact that the informant was not anonymous. Thornton was in police custody when he provided Bellizzi with the information relating to the defendant. The fact that an informant's identity is known to police is significant because "the informant could expect adverse consequences if the information that he provided was erroneous. Those consequences might range from a loss of confidence or indulgence by the police to prosecution for the class A misdemeanor of falsely reporting an incident under General Statutes § 53a-180, had the information supplied proved to be a fabrication." *State* v. *Barton*, supra, 219 Conn. 550–51. Additionally, the fact that Thornton was an individual with whom police had met face-to-face, rather than a mere anonymous tipster, "renders the informant more reliable because the police can observe the informant's demeanor to determine his . . . credibility . . . ." (Internal quotation marks omitted.) *State* v. *Batts*, 281 Conn. 682, 704, 916 A.2d 788, cert. denied, 552 U.S. 1047, 128 S. Ct. 667, 169 L. Ed. 2d 524 (2007); see also *State* v. *Hammond*, 257 Conn. 610, 622, 778 A.2d 108 (2001) (face-to-face conversations with informants are more credible and reliable because "the officer . . . has the opportunity to assess the informant's credibility and demeanor"). After discussing Thornton's knowledge of drugs with him face-to-face, Bellizzi found Thornton to be credible.

Adding to Thornton's reliability was the fact that he informed Bellizzi that he had previously engaged in illicit drug transactions with the defendant. In *Barton*, this court found highly probative the fact that an informant physically supplied police with a sample of a substance that police confirmed to be marijuana. *State* v. *Barton*, supra, 219 Conn. 551. Although Thornton did not provide such physical evidence or any specific dates or times of drug transactions that he engaged in with

the defendant, we nevertheless think it significant that Thornton admitted to Bellizzi that he had engaged in illicit drug activity with the defendant on prior occasions, and that this factor weighs in favor of finding the informant reliable. See *United States* v. *Harris*, 403 U.S. 573, 583, 91 S. Ct. 2075, 29 L. Ed. 2d 723 (1971) ("[a]dmissions of crime, like admissions against proprietary interests, carry their own indicia of credibility—sufficient at least to support a finding of probable cause to search"). Significantly, this court previously has credited admissions of the type Thornton provided in the present case. See *State* v. *Ferguson*, 185 Conn. 104, 109, 115, 440 A.2d 841 (1981) (informant's admission of narcotics purchase from defendant on particular date, in addition to general comment that informant "used to sell marijuana for" defendant both considered "statements linking [the informant] to criminal activity").

Partial corroboration of an informant's report by facts developed by police, as the court emphasized in *Illinois* v. *Gates*, supra, 426 U.S. 213, is another way to establish "the reliability of an untested informant's tip . . . ." *State* v. *Velez*, 215 Conn. 667, 674, 577 A.2d 1043 (1990). In *Gates*, the police received an anonymous tip stating that a man known as Lance Gates would be flying to Florida and that shortly after his arrival, the man would drive his family car from Florida to his home in Illinois, and that he would be transporting "over $100,000 in drugs." (Internal quotation marks omitted.) *Illinois* v. *Gates*, supra, 225. After a police investigation confirmed these travel arrangements, a search warrant was obtained for the vehicle, and during the search drugs were found. Id., 227. The court held that corroboration by police investigation was sufficient to establish probable cause, even though the unknown informant's basis of knowledge was not clear and his past reliability was unknown. Id., 241–46; see *United States* v. *Greenburg*, 410 F.3d 63, 69 (1st Cir. 2005) ("[c]orroboration of

apparently innocent activity can establish the reliability of the informant because the activity might come to appear suspicious in light of the initial tip"); *State* v. *Hunter*, 27 Conn. App. 128, 134, 604 A.2d 832 (1992) (reliability of untested informant verified and probable cause present under totality of circumstances after independent police investigation corroborated large portion of informant's tip).

In the present case, the trial court found that police surveillance verified details related by Thornton to Bellizzi. Specifically, the police observed the defendant, who matched the informant's description—a tall, thin, African-American male in his mid-twenties, wearing a New York Yankees baseball cap—arrive at the prearranged destination at the appointed time. These facts, together with Bellizzi's belief that Thornton was knowledgeable about drugs and drug purchases, support the informant's reliability.

Establishing an informant's basis of knowledge can also be an important part of assessing probable cause under the totality of the circumstances approach. This court previously has stated that "the surest way to establish a basis of knowledge is by a showing that the informant is passing on what is to him first-hand information . . . [as] when a person indicates he has overheard the defendant planning or admitting criminal activity . . . ." (Internal quotation marks omitted.) *State* v. *Smith*, 257 Conn. 216, 225, 777 A.2d 182 (2001) (noting that informant overhearing defendant planning or admitting criminal activity "highly relevant" to establishing probable cause under *Gates*), on appeal after remand, 94 Conn. App. 188, 891 A.2d 974, cert. denied, 278 Conn. 906, 897 A.2d 100 (2006); accord *State* v. *Velasco*, supra, 248 Conn. 193 (quoting with approval trial court's finding that " 'the informant's reported personal observation of narcotics sales by the defendant constituted a sufficient basis for the informant's knowl-

edge that the defendant had engaged in illegal narcotic[s] transactions' "); *State* v. *Morrill*, 205 Conn. 560, 566, 534 A.2d 1165 (1987) ("The affidavit states that the informant personally observed the defendant sell [marijuana] and [that] he heard the defendant state that he had ten pounds to sell. From these statements the magistrate could reasonably have inferred that the defendant was engaged in the ongoing criminal activity of selling [marijuana].").

In the present case, Bellizzi witnessed the informant placing two telephone calls, ostensibly to the defendant, to set up a drug purchase. Further, Bellizzi had the opportunity to assess Thornton's demeanor both during and after the telephone calls. Thus, not only was Thornton "passing on" firsthand information to authorities, but Bellizzi had the opportunity to observe the exchange of this information as it occurred. The defendant contends that Bellizzi did not take sufficient measures to ensure that Thornton was actually speaking to the defendant on the telephone, and to eliminate the possibility that Thornton was, for example, speaking into a "dead phone." It is true that Bellizzi could have been somewhat more circumspect in his oversight of Thornton's telephone call to an individual Thornton claimed was his drug supplier. The situation presented here, however, is at least as robust in establishing a basis of knowledge as is the case in *State* v. *Smith*, supra, 257 Conn. 225, in which this court held that an informant's report to police that he merely *overheard* the defendant planning or admitting criminal activity was " 'highly relevant' " under the *Gates* test. In the present case, the likelihood of fabrication was attenuated, as Bellizzi was able to assess Thornton's credibility throughout the entire transaction—before, during and after Thornton had placed the telephone calls to the defendant. Given Bellizzi's extensive narcotics enforcement experience, due weight should be given to his ability to

assess the credibility of Thornton and the reliability of his statements. *State* v. *Batts*, supra, 281 Conn. 704; see also *State* v. *Tuck*, 90 Conn. App. 872, 878–79, 879 A.2d 553 (2005).

The Appellate Court's opinion in *State* v. *Orellana*, 89 Conn. App. 71, 872 A.2d 506, cert. denied, 274 Conn. 910, 876 A.2d 1202 (2005), a case with similar facts, is instructive as well. In *Orellana*, the defendant sought to suppress evidence procured by police through a tip from an informant with whom police previously had worked. Specifically, the informant contacted a police officer and offered to have heroin delivered to a specific location. Id., 73–74. By means of her cellular telephone, and in the presence of the officer, the informant contacted the defendant and arranged for him to deliver 350 packets of heroin to a location the defendant and the informant had used in prior drug transactions. Id., 74. The informant provided the police with a physical description of her associates ("two Hispanic men") and their automobile ("older model, gold colored, four door Nissan"), in addition to the time ("between 5:15 and 5:30 that evening") and place ("either the corner of Park and Stanley Streets or to a gasoline station at the intersection of East Main and Stanley Streets") for the exchange. Id. Police officers stopped the vehicle after it made a U-turn and approached the gasoline station at one of the alternate locations described by the informant. Id.

The Appellate Court concluded that the trial court properly had denied the defendant's motion to suppress the evidence seized in conjunction with his arrest because the state had demonstrated probable cause to make the arrest. Id., 84. Specifically, the court found the informant to be reliable based in part on her prior record of providing information that had led to arrests. Significantly, though, the court found that the informant's telephone call to the defendant *"in [the officer's]*

*presence*," in addition to the informant's decision to choose the delivery location she had used previously with the defendant, demonstrated that the informant had overheard the defendant planning criminal activity. (Emphasis in original.) Id., 82. "Such firsthand information," the Appellate Court concluded, "was a sure way of demonstrating the informant's basis of knowledge." Id. Similarly, in the present case, Thornton's telephone calls to the defendant in Bellizzi's presence, in addition to his choice of a location that the two had used previously, constitutes "firsthand information" supporting an inference of the informant's basis of knowledge.

We therefore agree with the trial court's conclusion that the police had probable cause to believe that narcotics would be found either on the defendant's person or in his vehicle upon his arrival at the parking lot at 188 Allen Street. Accordingly, we reject the defendant's claim that the search and seizure violated his federal constitutional rights.

B

We next consider the defendant's claim that the judgment of conviction should be reversed because the trial court violated article first, § 7, of the Connecticut constitution[5] by denying the defendant's motion to suppress evidence obtained as a result of his warrantless arrest, which was made without probable cause. Specifically, the defendant contends that the trial court improperly applied the totality of the circumstances approach, as set forth in *Gates* and in *Barton*, to determine whether probable cause existed under the Connecticut constitution for the warrantless arrest of the defendant based

[5] Article first, § 7, of the Connecticut constitution provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

on an informant's tip. The defendant contends that a warrantless arrest based on the tip of an informant requires a stricter standard of review under the state constitution—the *Aguilar-Spinelli* test—than is required under the totality of the circumstances test under the federal constitution. The state responds that the trial court properly denied the defendant's motion to suppress the evidence seized by the police because the trial court properly applied the totality of the circumstances approach to determining probable cause under article first, § 7, of the constitution of Connecticut as set forth in *State* v. *Barton*, supra, 219 Conn. 529. We agree with the state.

We begin with a brief review of the legal principles relevant to warrantless arrests and the determination of probable cause under the Connecticut constitution. "Under both the federal and the state constitutions, a warrantless search and seizure is per se unreasonable, subject to a few well defined exceptions." *State* v. *Velasco*, supra, 248 Conn. 189, citing *Katz* v. *United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967). In this state, however, General Statutes § 54-1f (b) authorizes a police officer to conduct a warrantless arrest of "any person who the officer has reasonable grounds to believe has committed or is committing a felony." "The phrase 'reasonable grounds to believe' is synonymous with probable cause." *State* v. *Nowell*, 262 Conn. 686, 697, 817 A.2d 76 (2003). This court previously has noted that the determination of whether probable cause exists under article first, § 7, of our state constitution, is made pursuant to a totality of the circumstances test. *State* v. *Barton*, supra, 219 Conn. 544.

Prior to adopting this test for assessing probable cause under our state constitution, however, this court used the two-pronged *Aguilar-Spinelli* test for assessing probable cause based on an informant's report. After the United States Supreme Court adopted the totality of the circumstances approach for the deter-

mination of probable cause under the federal constitution in *Gates*, this court initially declined to adopt that approach for purposes of article first, § 7, of the constitution of Connecticut, noting that federal law "establishes a minimum national standard for the exercise of individual rights and does not inhibit state governments from affording higher levels of protection for such rights." (Internal quotation marks omitted.) *State* v. *Kimbro*, 197 Conn. 219, 234–35, 496 A.2d 498 (1985).

This court changed course in *State* v. *Barton*, supra, 219 Conn. 544, however, and adopted the totality of the circumstances test, overruling its prior decision in *Kimbro*. *Barton*, a warrant case, involved a defendant who had been charged with the crimes of possession of marijuana with the intent to sell and possession of marijuana. The defendant moved to suppress certain evidence seized from his apartment on the ground that the warrant issued for the search was not supported by probable cause because the affidavit accompanying it failed to state the informant's basis of knowledge. Id., 531–33. The trial court granted the motion and dismissed the charges and the Appellate Court affirmed the judgment. *State* v. *Barton*, 22 Conn. App. 62, 576 A.2d 561 (1990). This court reversed the judgment of the Appellate Court, and concluded that the warrant affidavit at issue did satisfy the requirements of article first, § 7, under the totality of the circumstances test. *State* v. *Barton*, supra, 219 Conn. 534. With regard to the separate prongs that characterized the *Aguilar-Spinelli* test, this court stated the following: "[O]ver time, the case law applying the *Aguilar-Spinelli* test has come to be encrusted with an overlay of analytical rigidity that is inconsistent with the underlying proposition that it is the constitutional function of the magistrate issuing the warrant to exercise discretion in the determination of probable cause. That discretion must be controlled by constitutional principles and guided by the eviden-

tiary standards developed in our prior cases, but it should not be so shackled by rigid analytical standards that it deprives the magistrate of the ability to draw reasonable inferences from the facts presented." Id., 543–44. As under the federal constitution, the core inquiries of the *Aguilar-Spinelli* test, namely, whether an informant is reliable and has a sound basis for the information he provides, "remain highly relevant in the determination of probable cause" under our state constitution. *State* v. *Respass*, supra, 256 Conn. 175. Given the court's language in *Barton*, overruling *Kimbro* for cases wherein probable cause is established by a warrant, the defendant contends that *Barton* did not overrule *Kimbro* in nonwarrant cases involving a tip from an informant, and that the two-pronged *Aguilar-Spinelli* approach should be employed for arrests without a warrant. We disagree.

We begin with the observation that this court previously has not employed two different standards for assessing probable cause depending on the presence or absence of a warrant.[6] We find the words of the

[6] We note that this court previously has rejected the notion that a "universal probable cause standard" is required "whenever the police restrain personal freedom to any degree." (Internal quotation marks omitted.) *State* v. *White*, 229 Conn. 125, 152, 640 A.2d 572 (1994); see *State* v. *Lipscomb*, 258 Conn. 68, 75, 779 A.2d 88 (2001) (under fourth amendment to federal constitution and article first, §§ 7 and 9, of our state constitution police officer may make investigatory stop under appropriate circumstances even in absence of probable cause); *State* v. *Lamme*, 216 Conn. 172, 184, 579 A.2d 484 (1990) (holding that due process standard of article first, § 9, of Connecticut constitution "permit[s] a brief investigatory detention, even in the absence of probable cause, if the police have a reasonable and articulable suspicion that a person has committed or is about to commit a crime"). Abundant federal case law also supports this general principle under the fourth amendment to the federal constitution. See, e.g., *O'Connor* v. *Ortega*, 480 U.S. 709, 725–26, 107 S. Ct. 1492, 94 L. Ed. 2d 714 (1987) (government employers permitted to conduct warrantless, work-related searches of employees' desks and offices in absence of probable cause); *New Jersey* v. *T. L. O.*, 469 U.S. 325, 341, 105 S. Ct. 733, 83 L. Ed. 2d 720 (1985) (school officials permitted to conduct warrantless searches of certain student property without probable cause).

Maryland Court of Special Appeals, when it was presented with the issue with which we are faced today, instructive in this regard. "It is a truism that probable cause is probable cause is probable cause. The heart of the warrant requirement is that judges should make the probable cause determination whenever feasible and that the probable cause determination should be entrusted to the policeman only when exigency requires it. When there is an exigency requiring immediate action, however, the policeman is permitted to make the determination that ordinarily is entrusted to the judge. *It is self-evidently the same determination, not a more rigorous one. The authority to make the determination has been shifted from one party to another; the nature of the determination itself, however, has not been altered. There was never any suggestion that there be two, rather than one, standards for assessing probable cause. The creation of two separate and distinct probable cause standards would represent a gratuitous and unnecessary complication of an already complicated area of constitutional law.*" (Emphasis added.) *Malcolm* v. *State*, 70 Md. App. 426, 437, 521 A.2d 796 (1987), aff'd in part, vacated in part on other grounds, 314 Md. 221, 550 A.2d 670 (1988).

We next point out that since *Barton*, both this court and the Appellate Court repeatedly have applied the totality of the circumstances approach in nonwarrant situations.[7] Moreover, many of the reasons set forth in

[7] See, e.g., *State* v. *Canales*, 281 Conn. 572, 916 A.2d 767 (2007); *State* v. *Nowell*, supra, 262 Conn. 686; *State* v. *James*, 261 Conn. 395, 802 A.2d 820 (2002); *State* v. *Smith*, supra, 257 Conn. 216; *State* v. *Velasco*, supra, 248 Conn. 183; *State* v. *Thomas*, 98 Conn. App. 542, 909 A.2d 969 (2006), cert. denied, 281 Conn. 910, 916 A.2d 53 (2007); *State* v. *Dalzell*, 96 Conn. App. 515, 901 A.2d 706 (2006), rev'd on other grounds, 282 Conn. 709, 924 A.2d 809 (2007); *State* v. *Days*, 89 Conn. App. 789, 875 A.2d 59, cert. denied, 275 Conn. 909, 882 A.2d 677 (2005); *State* v. *Orellana*, supra, 89 Conn. App. 71; *State* v. *Aylward*, 88 Conn. App. 90, 868 A.2d 106, cert. denied, 273 Conn. 935, 875 A.2d 543 (2005); *State* v. *Parker*, 84 Conn. App. 739, 856 A.2d 428 (2004), cert. denied, 272 Conn. 912, 866 A.2d 1285 (2005); *State* v. *Jenkins*, 82 Conn. App. 111, 842 A.2d 1148 (2004); *State* v. *Jeffreys*, 78 Conn. App.

*Barton* for adopting the totality of the circumstances approach are equally applicable to the nonwarrant context. This court in *Barton* was concerned that the cumbersome *Aguilar-Spinelli* test was compromising a magistrate's "ability to draw reasonable inferences from the facts presented." *State* v. *Barton,* supra, 219 Conn. 544. Implicit in the *Barton* decision is the notion that probable cause should be a more flexible concept than it had become under the application of the rigid *Aguilar-Spinelli* test, and that the two prongs used to assess the credibility of an informant ought not be entirely distinct. We believe that these concerns apply even more strongly to nonwarrant situations, when police officers must quickly assess fast changing circumstances in the field in deciding whether there is probable cause to arrest.

An additional problem with employing separate standards for probable cause in warrant versus nonwarrant situations is that police officers assessing probable cause in the field would be forced to contend with a more rigorous test than would magistrates with legal training who review warrant applications. We find that such a dichotomy would be particularly troubling. In *Malcolm* v. *State,* supra, 70 Md. App. 428, the Maryland Court of Special Appeals rejected the defendant's invitation to apply two separate standards for assessing probable cause—one standard where a warrant is present "and another, stricter standard" for probable cause in the absence of a warrant. Critical to the decision in

659, 828 A.2d 659, cert. denied, 266 Conn. 913, 833 A.2d 465 (2003); *State* v. *Austin,* 74 Conn. App. 802, 813 A.2d 1060, cert. denied, 263 Conn. 910, 821 A.2d 766 (2003); *State* v. *Arline,* 74 Conn. App. 693, 813 A.2d 153, cert. denied, 263 Conn. 907, 819 A.2d 841 (2003); *State* v. *Cooper,* 65 Conn. App. 551, 783 A.2d 100, cert. denied, 258 Conn. 940, 786 A.2d 427 (2001); *State* v. *Hedge,* 59 Conn. App. 272, 756 A.2d 319 (2000); *State* v. *Conley,* 31 Conn. App. 548, 627 A.2d 436, cert. denied, 227 Conn. 907, 632 A.2d 696 (1993); *State* v. *Santiago,* 27 Conn. App. 741, 610 A.2d 666, cert. denied, 223 Conn. 906, 610 A.2d 179 (1992); *State* v. *Hunter,* supra, 27 Conn. App. 128.

*Malcolm* was the notion that it would make little sense to require police officers, who are often required to make split second decisions regarding probable cause, to adhere to the cumbersome *Aguilar-Spinelli* framework while exempting trained judges from this rigorous analytical scheme. "The argument against subjecting officers who draft affidavits and judges who issue warrants to formal rules appropriate only to the courtroom applies with equal, if not greater, force to subjecting officers in the field to such courtroom standards. . . . If a judge cannot be expected to negotiate the labyrinth without getting hopelessly lost, a fortiori, the officer cannot." Id., 440. We agree.

We are not persuaded by the defendant's claim that *Barton* did not overrule *Kimbro* when an informant is involved in a nonwarrant situation because "warrantless searches and seizures that rely on tips from informants require a more stringent standard of review, under the Connecticut constitution."[8] First, the court in *Barton* did not provide any indication that its decision to overrule *Kimbro* would not apply in the situation the defendant describes. Additionally, it must be emphasized that "because the totality of circumstances approach provides only an alternative method for determining the existence of probable cause, it does not affect the quality or quantum of evidence necessary to establish probable cause. . . . [T]he totality of circumstances test simply allows a court to consider all the relevant evidence in determining whether probable cause exists; it does not increase the level of evidence

[8] The *Gates* court explicitly addressed the role that informants' tips can play in the criminal justice system when it noted that anonymous tips "frequently contribute to the solution of otherwise 'perfect crimes.'" *Illinois* v. *Gates*, supra, 462 U.S. 238. Indeed, the court noted that because "anonymous tips seldom could survive a rigorous application of either of the *Spinelli* prongs," the rigid application of that test could well thwart law enforcement efforts. Id., 237.

necessary to support a determination of probable cause." *State* v. *Velasco*, supra, 248 Conn. 192.

We conclude that the totality of the circumstances test is the proper test for determining whether probable cause existed to effectuate the arrest of the defendant in the present case under our state constitution. Having previously concluded in part I A of this opinion that probable cause was present in accordance with the totality of circumstances approach under the federal constitution, we reach the same conclusion under our state constitution. Accordingly, the trial court properly denied the defendant's motion to suppress the evidence seized incident to the defendant's arrest.

## II

The defendant next claims that the trial court's instructions to the jury prior to closing arguments unconstitutionally restricted his right to an effective closing argument. Specifically, the defendant asserts that the trial court improperly instructed jurors to disregard any portion of counsels' closing argument that "goes beyond the [parameters] permitted in the argument . . . ." The state responds that the court's instructions prior to closing argument were not improper, and that the defendant was not unconstitutionally deprived of his right to an effective closing argument. Because no exception was taken to the instructions at trial, the defendant seeks to prevail under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). We agree with the state that there was no constitutional violation.

The following additional facts and procedural history are relevant to the resolution of this claim. Prior to closing arguments, the trial court gave instructions to jurors with regard to the propriety of the attorneys' comments during summation. The court began by informing jurors generally that argument by the attor-

neys is not evidence in the case, and that attorneys are prohibited from stating their personal opinions regarding the facts or the credibility of witnesses. The court continued by noting that attorneys are not permitted to make arguments to jurors that are intended to arouse emotions or sympathy on the part of jurors. The court additionally noted that although attorneys may refer to their own recollection of the evidence in the case, it is the jurors' recollection of the evidence that must control deliberations. Finally, the court noted: "If either of the attorneys makes an argument to you which goes beyond the [parameters] permitted in the argument, you are instructed to disregard that portion of the argument entirely and you may not allow it to influence your deliberations or your verdict in any manner."[9]

To prevail on a claim of constitutional error not preserved at trial, the defendant must satisfy all four of the elements set forth in State v. Golding, supra, 213 Conn. 239–40.[10] In the present case, the defendant has failed to meet the second prong of Golding, namely, that his claim is one of constitutional magnitude that alleges the violation of a fundamental right. The defendant relies on a number of recent Connecticut cases for the proposition that his constitutional right to an effective closing argument was restricted. A careful

---

[9] After this appeal was filed, the state filed a motion to rectify the record of the trial court's charge to reflect the court reporter's revision of the transcript to amend a transcription error, which the trial court granted on February 5, 2007. The instruction as we have quoted herein is the rectified instruction.

[10] In State v. Golding, supra, 213 Conn. 239–40, this court held that "a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.)

review of these cases, however, reveals that none supports the proposition that the defendant's claim is one of constitutional magnitude.[11]

The defendant first relies on *State* v. *Cruz*, 71 Conn. App. 190, 208, 800 A.2d 1243, cert. denied, 261 Conn. 934, 806 A.2d 1067 (2002), in which the Appellate Court ruled that the trial court did not abuse its discretion in precluding the defendant from making a "missing witness" argument. As this court has previously explained, however, "[t]he giving of a [missing witness] charge is purely an evidentiary issue and is not a matter of constitutional dimensions." (Internal quotation marks omitted.) *State* v. *Malave*, 250 Conn. 722, 738, 737 A.2d 442 (1999), cert. denied, 528 U.S. 1170, 120 S. Ct. 1195, 145 L. Ed. 2d 1099 (2000). *State* v. *Arline*, 223 Conn. 52, 612 A.2d 755 (1992), is similarly unhelpful. In *Arline*, this court concluded that a defendant was deprived of his constitutional right to the effective assistance of counsel when the trial court "barred the defendant's attorney from referring to the filing of a notice of claim against the state and to the criminal charges against the complainant that arose between the time of the alleged sexual assault and the trial." Id., 63. In the present case, the defendant does not argue that the court actually prevented him from presenting specific evidence; rather, the defendant's assertion is that the court instructed the jury to disregard certain parts of defense counsel's argument. The defendant finally relies on *State* v. *McCown*, 68 Conn. App. 815, 793 A.2d 281, cert. denied, 260 Conn. 927, 798 A.2d 972 (2002). In *McCown*, the Appellate Court affirmed the judgment of the trial court, which prevented a criminal defendant's attorney from arguing to the jury during closing argument about the likely effects of the defendant's age on his ability to realize the intent of others. The

---

[11] Indeed, the defendant himself concedes that he "is hard-pressed to cite a case similar to that presented sub judice . . . ."

Appellate Court reasoned that the trial court merely "limited the scope of closing arguments to those facts that were in evidence or to the reasonable inferences that could have been drawn from those facts," as no evidence had been presented at trial "from which the jury could infer that the defendant . . . lacked the capacity to recognize the intent of others." Id., 824. *McCown* thus similarly fails to provide support for the notion that the defendant in the present case suffered a deprivation of constitutional magnitude.

The court's instruction in the present case was perhaps ill conceived in that the court instructed jurors to disregard certain improper parts of arguments made by counsel during summation without first defining for jurors the proper scope of a closing argument. The fact remains, however, that this instruction represented only a single sentence in the entire instruction, and the court later provided jurors with further explanation regarding how to interpret the attorneys' words.[12] Considering the instruction in the context of the entire charge and the entire trial, rather than as an individual sentence viewed in isolation, we conclude that the alleged violation was not of constitutional magnitude. See *State* v. *Davis*, 255 Conn. 782, 798, 772 A.2d 559 (2001) ("[w]hen reviewing [a] challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts" [internal quotation marks omitted]).

---

[12] The court later instructed the jury: "In reaching your verdict you should consider all the testimony and exhibits received into evidence. Certain things are not evidence and you may not consider them in deciding what the facts are. These include: First, arguments of statements by lawyers. The lawyers are not witnesses. What they have said in their closing arguments and at other times is intended to help you interpret the evidence, but it is not evidence. If the facts as you remember them differ from the way the lawyers have stated them, your memory of them controls . . . ."

The defendant additionally requests that this court exercise its supervisory powers to review this claim. "Our supervisory powers . . . are an *extraordinary* remedy to be invoked only when circumstances are such that the issue at hand, while not rising to the level of a constitutional violation, is nonetheless of utmost seriousness, not only for the integrity of a particular trial but also for the perceived fairness of the judicial system as a whole." (Emphasis in original; internal quotation marks omitted.) *State* v. *Hines*, 243 Conn. 796, 815, 709 A.2d 522 (1998). We cannot conclude that the trial court jeopardized the integrity of the trial and the fairness of our judicial system as a whole under the circumstances presented. Accordingly, we decline to exercise our supervisory powers.

The judgment is affirmed.

In this opinion the other justices concurred.