## STATE OF CONNECTICUT *v.* MICHAEL KOWALYSHYN
## (AC 29336)

Lavine, Beach and Hennessy, Js.

---

Argued October 19, 2009—officially released January 5, 2010

*Glenn W. Falk,* special public defender, with whom, on the brief, was *Emilia W. Vandenbroek,* for the appellant (defendant).

*James M. Ralls,* senior assistant state's attorney, with whom, on the brief, were *Patricia M. Froehlich,* state's attorney, and *Mark A. Stabile,* supervisory assistant state's attorney, for the appellee (state).

*Opinion*

BEACH, J. The defendant, Michael Kowalyshyn, appeals from the judgment of conviction, following a jury trial, of attempt to commit assault in the second degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-60, threatening in the second degree in violation of General Statutes § 53a-62, reckless endangerment in the second degree in violation of General Statutes § 53a-64, intimidation based on bigotry or bias in the second degree in violation of General Statutes § 53a-181k and disorderly conduct in violation of General Statutes § 53a-182.[1] The defendant claims that (1) the court improperly denied his motion to suppress certain statements he made following his arrest and (2) there was insufficient evidence to support his conviction of intimidation based on bigotry or bias in the second degree. We affirm the judgment of the trial court.

The following facts, which the jury reasonably could have found, and procedural history are relevant. In September, 2005, Scott Beattie was living in Willimantic in a

---

[1] The defendant was also charged with and found not guilty of attempt to commit assault in the first degree in violation of General Statutes §§ 53a-49 (a) (2) and 53a-59.

tent in a wooded area behind a museum. The defendant, with whom Beattie was acquainted, set up his tent in the same area. Beattie moved his tent to different spots in the wooded area numerous times, and the defendant persisted in moving his tent next to Beattie's tent.

On September 12, 2005, the defendant, Beattie and an unidentified man, who had indicated that he was homosexual, consumed alcohol together in a park for approximately one hour beginning at noon. The unidentified man indicated that he wanted to go to the campsite as well but did not go. While back at the campsite, the defendant informed Beattie that he did not want " 'fags' " around the campsite.

That evening, Beattie drank vodka and soda, along with beer, in his tent but was not drunk. Later in the evening, the defendant sat outside Beattie's tent, and they drank together. Between approximately 10:15 and 10:20 p.m., Beattie and the defendant began arguing. At some point, Beattie removed some or all of his clothes. The defendant began yelling at Beattie that "he must be a fag" because "[o]nly a fag would take his clothes off in front of another man" and because he had been "hanging around" with the unidentified man who had stated he was homosexual. Beattie yelled back at the defendant that he was not a "fag." The two men wrestled or fought for approximately fifteen to twenty minutes. Sometime during the argument, while Beattie was on his hands and knees with his back turned, the defendant poured vodka on Beattie. The defendant attempted to ignite a handheld lighter but was unable to do so. At that point, Beattie grabbed the defendant by the throat, and the defendant put Beattie in a headlock. Before leaving, the defendant told Beattie that he would be back to "burn you with gasoline; I'll do it right this time." Beattie was afraid that the defendant would return and, as a result, stayed awake during the night. Beattie did not try to leave the wooded area because he had night

blindness, and the only exit was through a path that crossed in front of the defendant's tent.

The following morning, Beattie walked into town and told the director of a local soup kitchen about the incident, and subsequently Beattie telephoned the police. Beattie then went to the Willimantic police department, was interviewed and gave a statement. After an officer investigated the campsite, the police arrested the defendant.

After reviewing and executing a waiver of rights, the defendant made oral and written statements to the police. The defendant used the derogatory term "fag" numerous times in his statement and indicated that when Beattie removed his clothes, he yelled at Beattie that "he must be a fag" because "[o]nly a fag would take his clothes off in front of another man" and because he had been "hanging around" with the unidentified man who had stated he was homosexual.[2] Following a

[2] The defendant did not testify at trial. His statement was read into evidence by a police officer who was present when the defendant made the statement. It also was admitted as an exhibit. In his statement, the defendant gave the following version of events: "On September 12, 2005 around noon I was sitting with Scott Beattie and some black guy who said he was a homosexual, next to the [Jillson Square movie theaters]. We drank for about an hour or so. All three of us then went to the benches in front of the park. The black guy was arguing with Scott about some checks. We drank a pint of vodka and a [six] pack of beer. Scott took off to the campsite we live at. The black guy stayed. I went to work on Carey Street for about one half hour. I bought a quart of vodka at the Elm's Package [Store]. I went back to the park benches. The black guy was lying on the bench passed out. The black guy wanted to go to the campsite. He wanted Scott to come get him and bring him back to the campsite. I only stayed a few minutes before I left to go to the campsite.

"At the campsite I told Scott I didn't want the fucking fags around our campsite. We went back to the park bench and found out that the police had arrested the black fag for public intoxication. I then went to [Harry's] house on Spring Street to get some batteries. I went back to the campsite around 4:00 p.m. Scott was at the campsite. Scott went to the soup kitchen and brought back some food around 5:00 p.m. We started to hook up our battery powered television. We started listening to the radio. We had a quart of vodka, a pint of vodka and [five] beers. Around 10:30 p.m. we started arguing. At one point Scott took all his clothes off and [laid down] in his

jury trial, the defendant was convicted of attempt to commit assault in the second degree, threatening in the second degree, reckless endangerment in the second degree, intimidation based on bigotry or bias in the second degree and disorderly conduct. The defendant was sentenced to eight years imprisonment followed by two years of special parole. This appeal followed.

I

The defendant first claims that that the court improperly denied his motion to suppress certain statements he made following his arrest. The defendant challenges the court's conclusion that probable cause existed to justify a warrantless arrest. He argues that probable cause did not exist because, in making the arrest, the police relied on Beattie's statement and Beattie was not reliable. The defendant argues that because the police lacked probable cause to arrest him, the statements he made following his arrest were fruit of the poisonous tree which should have been suppressed. We disagree.

Prior to trial, the defendant filed a motion to suppress his postarrest written and oral statements as "fruits of

tent. I was sitting in the doorway. I started yelling at him that he must be a fag. Only a fag would take his clothes off in front of another man. I also said that he must be a fag, because he was hanging around with that black fag. I had told him earlier that I didn't want him to bring that black fag to the campsite.

"Scott started bugging out. He was yelling that he wasn't [a] fag. He grabbed me by the throat. I pulled his hand from my throat and pinned his arms down until he calmed. I had to hold him down for about five minutes. I took my quart bottle back to my campsite. I sat up and drank for a while before going to sleep. When I woke up Scott was already gone.

"While we were drinking last night, arguing and fighting I had dumped some of my vodka on his tent floor. I told him to get his tent out of my campsite area. I did yell that if he didn't move his tent tomorrow that I would burn his tent.

"This morning I went to the soup kitchen. Scott was there. He was talking shit to everybody about me. He started up with me. He said he was going to the police that I attacked him. He said that I assaulted him. I said that I just held him down. He said that I didn't kick his ass, because I couldn't kick his ass. Crawford, an Access Agency Counselor, heard what was said."

an unlawful arrest." After holding a hearing, the court, in its memorandum of decision on the motion to suppress, found the following facts. "[O]n September 13, 2005 . . . Beattie came to the Willimantic police headquarters to complain that he had been assaulted by the defendant. In a written, notarized statement, Beattie claimed that the night before he and [the defendant], both homeless and drunk, argued and then engaged in physical fighting which, he said, [the defendant] initiated by dumping vodka on him and threatening to set him afire. After the investigating officer obtained Beattie's statement, he went to the scene of the crime. He observed the campsite area and an empty vodka bottle consistent with . . . Beattie's sworn statement. . . . The arresting officer found [the defendant] in a soup kitchen and placed him under arrest. Following his arrest, [the defendant] was brought to the Willimantic police department. After reviewing and executing a waiver of rights, [the defendant] made the oral and written statements which he [sought later] to suppress."

After setting forth the applicable law, the court, citing *State* v. *Bolanos*, 58 Conn. App. 365, 369, 753 A.2d 943 (2000), noted that citizen informers are presumptively reliable if they are identifiable. The court concluded that the officers had probable cause to arrest the defendant and, accordingly, denied his motion to suppress.

We first set forth our standard of review. "Our standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . ." (Internal quotation marks omitted.)

*State* v. *Burroughs*, 288 Conn. 836, 843, 955 A.2d 43 (2008).

Under the exclusionary rule, evidence must be suppressed if it is found to be the " 'fruit' " of prior police illegality. *Wong Sun* v. *United States*, 371 U.S. 471, 485, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963). "[T]he [exclusionary] rule does not distinguish between physical and verbal evidence . . . [it] extends to evidence that is merely derivative of the unlawful conduct, or what is known as the fruit of the poisonous tree." (Citations omitted; internal quotation marks omitted.) *State* v. *Brunetti*, 279 Conn. 39, 72, 901 A.2d 1 (2006), cert. denied, 549 U.S. 1212, 127 S. Ct. 1328, 167 L. Ed. 2d 85 (2007). "It is well established that statements obtained through custodial interrogation following the seizure of a person without probable cause, in violation of the fourth amendment, should be excluded unless intervening events break the causal connection between the arrest and the confession." *State* v. *Northrop*, 213 Conn. 405, 413, 568 A.2d 439 (1990).

"In order for a warrantless felony arrest to be valid, it must be supported by probable cause. . . . The determination of whether probable cause exists under the fourth amendment to the federal constitution . . . is made pursuant to a totality of circumstances test. . . . Probable cause exists when the facts and circumstances within the knowledge of the officer and of which he has reasonably trustworthy information are sufficient in themselves to warrant a man of reasonable caution to believe that a felony has been committed. . . . The probable cause test then is an objective one." (Citations omitted; internal quotation marks omitted.) *State* v. *Johnson*, 286 Conn. 427, 435–36, 944 A.2d 297, cert. denied, 555 U.S. 883, 129 S. Ct. 236, 172 L. Ed. 2d 144 (2008).

The defendant argues that certain factors undermine Beattie's reliability, such as the fact that he was trespassing by living in a tent on property owned by a power company and that he admitted drinking on the night in question. Trespassing, even if true, does not necessarily affect credibility. Consumption of alcohol, though relevant, does not necessarily destroy credibility. The investigating officer, John Reed, met with Beattie in person, took his statement and was able to observe his demeanor and to consider his credibility. Reed also investigated the campsite where he found corroborating evidence. He apparently deemed Beattie to have been credible.

Some factors support Beattie's reliability. A factor supporting an inference of Beattie's reliability or veracity is the fact that he was not anonymous. See id., 438. The fact that his identity was known to police is significant because he could expect adverse consequences if the information that he provided was erroneous. See id. Additionally, the fact that Beattie was an individual with whom police had met face-to-face renders him "more reliable because the police can observe the informant's demeanor to determine his . . . credibility . . . ." (Internal quotation marks omitted.) Id. In addition, Beattie was not an anonymous or "underworld" informer. "Although anyone who gives information to the police in confidence might be called a 'confidential informant,' the term is usually employed in a more restricted sense to describe a person who is himself in the underworld, so that he is particularly well placed to know its secrets. Courts have properly distinguished between such 'confidential informants' and the average citizen who, as a victim or a witness, happens to have information useful to the police. Such 'citizen informers' are considered more deserving of credibility than are underworld informers, and courts

have accordingly tended to examine the basis and sufficiency of a citizen informer's information more closely than his credibility." *State* v. *Barton*, 219 Conn. 529, 542 n.10, 594 A.2d 917 (1991). "[A] citizen-informer . . . is more deserving of belief than the typical informant from a criminal mileu. . . . It is generally agreed . . . that a comparable showing is not needed to establish veracity when the information comes from an average citizen who is in a position to supply information by virtue of having been a crime victim or a witness." (Citations omitted; internal quotation marks omitted.) *State* v. *Daley*, 189 Conn. 717, 723–24, 458 A.2d 1147 (1983).

Additionally, a police officer went to the scene and observed facts that were not inconsistent with Beattie's statement, such as the campsite area and an empty bottle of vodka. The defendant argues that this partial corroboration was not enough and that "[g]iven the frequent drinking that occurred at the campsite, an empty vodka bottle is scarce evidence of a felony assault." He also argues that the investigating officer testified that he did not observe any bruises on Beattie consistent with the violent fight he had described. Partial corroboration, however, is a way to establish reliability. *State* v. *Johnson*, supra, 286 Conn. 439–40. "[C]orroboration of apparently innocent activity can establish the reliability of the informant because the activity might come to appear suspicious in light of the initial tip." Id., citing *United States* v. *Greenburg*, 410 F.3d 63, 69 (1st Cir. 2005).

The court properly concluded that probable cause existed to arrest the defendant. As a result, the defendant's claim that his statements should have been suppressed as fruit of the poisonous tree fails. The court properly denied the defendant's motion to suppress.

## II

The defendant next claims that there was insufficient evidence to support his conviction of intimidation based on bigotry or bias in the second degree because the state failed to prove beyond a reasonable doubt that the defendant had the requisite specific intent to intimidate or to harass Beattie because of Beattie's actual or perceived sexual orientation. We disagree.

Section 53a-181k (a) provides: "A person is guilty of intimidation based on bigotry or bias in the second degree when such person maliciously, and with specific intent to intimidate or harass another person because of the actual or perceived race, religion, ethnicity, disability, sexual orientation or gender identity or expression of such other person, does any of the following: (1) Causes physical contact with such other person, (2) damages, destroys or defaces any real or personal property of such other person, or (3) threatens, by word or act, to do an act described in subdivision (1) or (2) of this subsection, if there is reasonable cause to believe that an act described in subdivision (1) or (2) of this subsection will occur." Specific intent involves a "conscious objective . . . to cause [a] result . . . ." (Internal quotation marks omitted.) *State* v. *Holmes*, 75 Conn. App. 721, 737, 817 A.2d 689, cert. denied, 264 Conn. 903, 823 A.2d 1222 (2003).

"In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v.

*Jason B.*, 111 Conn. App. 359, 363, 958 A.2d 1266 (2008), cert. denied, 290 Conn. 904, 962 A.2d 794 (2009).

"It is well established that the question of intent is purely a question of fact. . . . Intent may be, and usually is, inferred from the defendant's verbal or physical conduct. . . . Intent may also be inferred from the surrounding circumstances. . . . The use of inferences based on circumstantial evidence is necessary because direct evidence of the accused's state of mind is rarely available. . . . Intent may be gleaned from circumstantial evidence such as . . . the events leading up to and immediately following the incident." (Internal quotation marks omitted.) *State* v. *Saez*, 115 Conn. App. 295, 302–303, 972 A.2d 277, cert. denied, 293 Conn. 909, 978 A.2d 1113 (2009).

The defendant takes issue only with the element of intent. He argues that the only evidence relating to sexual orientation was the defendant's September 13, 2005 statement to the police in which he frequently used the derogatory term "fag." His use of that term, he argues, is not sufficiently linked to any act that would violate the statute, namely, any physical contact with Beattie, damage done to Beattie's real or personal property or threat to violate the statute.

We begin our analysis by noting that the court instructed the jury on the issue of intent, and the defendant does not claim instructional error. The court first explained the conduct that could constitute a violation of § 53a-181k and instructed the jury that the state also must prove beyond a reasonable doubt that "the defendant had an improper motive for his actions, that being the sexual orientation of the other person. With respect to intent, again, intent relates to the condition of mind of the person who commits the act, that is, their purpose in doing it. A person acts intentionally, with respect to a result or conduct, when their conscious objective is

to cause that result or to engage in that conduct." The jury was instructed that it was required to find that the defendant acted with specific intent to harass or to intimidate Beattie in order to find the defendant guilty of that offense.

Under the facts of this case, there is sufficient evidence from which the jury reasonably could have determined that the defendant had the requisite specific intent to intimidate or to harass Beattie on the basis of Beattie's actual or perceived sexual orientation.[3] First, from the defendant's statement, which is replete with disparaging remarks against homosexuals, including his statement that he did not want "fags" at the campsite, the jury was free to infer that the defendant was biased toward homosexuals. Second, the jury also was free to believe, on the basis of the defendant's statement, that he believed that there was some question as to whether Beattie was homosexual. In his statement, the defendant said that because Beattie had removed his clothes in front of him and had hung around with the unidentified homosexual man, Beattie "must be a fag" and that he told Beattie so. Third, the jury reasonably could have found from the defendant's statement that shortly before the fracas, the defendant stated that he did not want the unidentified man at the campsite because he was homosexual. Just prior to the incident, the defendant announced that Beattie was homosexual, a characterization Beattie denied. The two men fought. The jury reasonably could have found that sometime during the fight, the defendant attempted to set Beattie on fire and warned Beattie that he would burn his tent if he did not move the tent by the following day. On the basis of this cumulative evidence, the jury could have inferred that the defendant acted with intent to harass or to

---

[3] Beattie did not testify as to any bigotry or bias. The jury, however, was free to infer such bigotry and bias from the defendant's statement to the police.

intimidate Beattie because of his actual or perceived sexual orientation. "Where there is sufficient evidence to support a reasonable inference that the defendant intended to commit the crime charged, whether such an inference should be drawn is properly a question for the jury to decide." (Internal quotation marks omitted.) *State* v. *Salmon*, 66 Conn. App. 131, 143, 783 A.2d 1193 (2001), cert. denied, 259 Conn. 908, 789 A.2d 997 (2002). "It is within the province of the jury to draw reasonable and logical inferences from the facts proven. . . . Our review is a fact based inquiry limited to determining whether the inferences drawn by the jury are so unreasonable as to be unjustifiable. . . . [W]e do not sit as a [seventh] juror who may cast a vote against the verdict based upon our feeling that some doubt of guilt is shown by the cold printed record." (Citations omitted; internal quotation marks omitted.) *State* v. *Winter*, 117 Conn. App. 493, 507, 979 A.2d 608 (2009).

It is indeed true that "hate crimes," such as the one at hand, typically implicate first amendment issues. With some rare exceptions, the use of offensive language in itself is, as a rule, protected speech. We must be careful to ensure that our courts do not apply the law in such a way as to chill protected speech. See, e.g., *State* v. *DeLoreto*, 265 Conn. 145, 155–56, 827 A.2d 671 (2003). Each case must be carefully evaluated on its facts. On the other hand, we are obligated to recognize and to effectuate legislative intent so far as such action is constitutionally permitted. Where values are potentially in conflict, courts have in analogous situations required careful jury instructions. We affirm the judgment today because the instructions are not at issue in this case and because there were sufficient facts before the jury to sustain the verdict.

The judgment is affirmed.

In this opinion the other judges concurred.